[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1087 
The appellant, Kathy Diane Birge, was indicted for murder made capital because it was committed for pecuniary gain, a violation of § 13A-5-40(a)(7), Ala. Code 1975 (Count I); second-degree forgery, a violation of § 13A-9-3(a)(1), Ala. Code 1975 (Count II); second-degree criminal possession of a forged instrument, a violation of § 13A-9-6, Ala. Code 1975 (Count III); and first-degree theft of property, a violation of §13A-8-3, Ala. Code 1975 (Count IV). She entered a guilty plea to Count II, second-degree forgery, and was sentenced to 20 years in prison. Count III was dismissed. Following a jury trial, Birge was convicted of capital murder under Count I and of first-degree theft under Count IV. She was sentenced to life in prison without parole for the capital-murder conviction and to 20 years in prison for the theft conviction. All the sentences were to run concurrently. Birge's notice of appeal indicates that she appealed all three convictions; however, none of her issues involve her conviction for second-degree forgery, entered pursuant to a guilty plea. In any event, the record indicates that prior to entering her guilty plea Birge reserved only one issue for review — whether her counsel had rendered ineffective assistance. However, she has not addressed that issue in her brief on appeal, and, therefore, it is deemed to be abandoned. Lewis v. State, 889 So.2d 623, 677-78
(Ala.Crim.App. 2003).
The sufficiency of the evidence has not been challenged on appeal; therefore, a detailed statement of the evidence presented at trial is unnecessary. For purposes of introduction, a brief recitation of the State's evidence will suffice; additional pertinent facts will be presented as necessary.
The State's evidence indicated that Birge's husband, Cecil Birge, died in Alabama of what initially appeared to be natural causes and that his body was flown to Indiana for burial. Later, after suspicions arose concerning the circumstances surrounding Cecil's death, Cecil's body was exhumed, and an autopsy was performed. Dr. John Pless, a professor of pathology at the Indiana University School of Medicine, performed the autopsy. Relying on a toxicology *Page 1088 
report prepared by employees at an independent laboratory, he testified that Cecil had died of an overdose of multiple prescription drugs. Dr. Pless concluded that the prescription drugs found in Cecil's body were taken within a few hours of death and that they were at lethal levels in the body. He ruled out the possibility of death by natural causes. The State also presented evidence indicating that Birge had access to the prescription drugs found in Cecil's body, that she had administered those drugs secretly to Cecil, and that she had refused to obtain medical assistance for Cecil when he became ill from the drugs. Evidence was presented that Birge had discussed with a friend her desire to either hire a "hit man" to kill Cecil or to kill him with a drug overdose so that she could get the proceeds from his life-insurance policy; that Birge had changed Cecil's will to name her as the primary beneficiary and to make arrangements for his funeral, and had then forged his signature on the will; that Birge had changed Cecil's employee-benefits account to name her as the primary beneficiary. In addition, evidence was presented indicating that Cecil was not ill during the days immediately before his death, even though Birge told others that he was gravely ill and suffered from various maladies, including cancer, heart disease, and colon polyps; that three days before his death, Birge had purchased from a local funeral home a contract for the cremation of Cecil's body, telling the employee of the funeral home that Cecil had been sick and that she was concerned that he had been mixing alcohol and Valium; that following Cecil's death Birge told the Limestone County coroner that she was not aware of any medications that Cecil may have been taking, even though she had told others that he was taking a lot of medication and drinking heavily, and that she did not want an autopsy performed on Cecil's body; that Birge insisted that it was Cecil's desire to have his body cremated upon his death, even though Cecil had previously expressed to his daughter his desire to be buried in Indiana next to his son. Birge gave conflicting statements regarding the location and positioning of Cecil's body when she discovered it; a computer seized from Birge's home contained, among other things, numerous files that indicated that someone had visited various Web sites dealing with arsenic poisoning, venomous animals, and poisonous plants; and a computer seized from Birge's business contained numerous files that indicted that someone had searched the Internet for information regarding estate planning, probate, and wills.
The following issues are presented for our review:
 1) Whether the toxicology report, autopsy report, and opinion testimony of Dr. Pless concerning the cause of Cecil Birge's death should have been excluded from the evidence on the ground that they were unreliable and, therefore, not relevant for the jury's consideration (Issues I, II, and III in Birge's brief);
 2) Whether the admission of the toxicology report violated Birge's Sixth Amendment right to confrontation (Issue IV in Birge's brief);
 3) Whether the State violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to provide Birge with timely discovery of exculpatory evidence (Issue V in Birge's brief);
 4) Whether the State failed to comply with the trial court's open-discovery order in violation of Ex parte Monk, 557 So.2d 832 (Ala. 1989) (Issue VI in Birge's brief);
 5) Whether the trial court erred in allowing the State to impeach one of its own witnesses (Issue VII in Birge's brief); *Page 1089 
 6) Whether the trial court erred to reversal by giving additional instructions to the jury outside Birge's presence (Issue VIII in Birge's brief); and
 7) Whether the cumulative effect of trial error necessitates the granting of a new trial (Issue IX in Birge's brief).[1]
 I.
With respect to the first issue, Birge contends that the toxicology report prepared by the American Institute of Technology Laboratories ("AIT lab"), which Dr. Pless relied on in forming his opinion as to the cause of Cecil Birge's death, and Dr. Pless's autopsy report and opinion testimony should have been excluded from the evidence by the trial court. Specifically, Birge argues that "the State of Alabama failed to properly identify the body on which Dr. Pless performed an autopsy" and, therefore, that "his testimony and the resulting autopsy reports and toxicology reports should not have been admitted." (Birge's brief at p. 45.) Birge also argues that Dr. Pless's testimony and autopsy findings should not have been admitted because, she says, the State never established a proper chain of custody for the samples submitted to the AIT lab.
An understanding of the circumstances surrounding the burial, exhumation, and autopsy of Cecil Birge are necessary to our resolution of the issues Birge has raised here. Cecil died at home on May 5, 2001. On that day, his body was transported to Twickenham Funeral Home, and an employee of the funeral home embalmed the body that evening. That employee dressed and cosmetized the body and then placed the body in a casket. Four days after Cecil's death, and after a visitation service was held, his body was flown to Indiana. Cecil's daughter, Michelle Swift, testified that Cecil's body was buried in Indiana, in the plot next to her brother's. When law-enforcement officers became aware that Birge had forged Cecil's will, they began to investigate. Swift granted permission for the exhumation of her father's body.
Sheriff Mike Blakely, Deputy District Attorney Brian Jones, and Investigator Bobby Smith traveled to Indiana for the exhumation and autopsy of Cecil's body. They observed the exhumation and assists ed in the transportation of the casket to the morgue at the Indiana University School of Medicine, where Dr. Pless performed the autopsy on May 25, 2001, 20 days after Cecil died.
Dr. Pless testified about his autopsy findings, and when he began to testify about the results from the toxicology report, Birge objected; the trial court held a hearing outside the jury's presence. Birge argued:
 "[W]hat this witness is about to testify to is the result of a toxicology test and toxicological findings that were conducted by other people, under labs that we don't know anything about.
 "We don't believe that this witness actually performed the toxicology test. We don't believe that this witness can testify to chain of custody on the specimens that were removed from the body.
 ". . . If he is going to testify to the findings we would hope that a proper foundation, which would include, the person who drew the blood sample. . . . We would ask the person who drew these samples, the person who transported *Page 1090 
them to the lab, the person who received them at the toxicology lab, the person who actually performed the testing and the person who calibrated the machines involved in the testing all testify. . . ."
(R. 572-74.) Birge also argued that samples taken from an embalmed body were not reliable, and that Dr. Pless was not an expert in forensic toxicology. Finally, Birge also objected on grounds that the State had failed to prove the chain of custody for Cecil's body.
The trial court stated that Alabama law provided that, if a witness has expertise beyond that of the jurors and if the testimony would help the jurors understand an issue, the witness could testify. (R. 576.) The court allowed Birge to ask Dr. Pless questions outside the jury's presence.
During the voir dire questioning, Dr. Pless testified that he withdrew samples from the body, placed the samples in vacuutainer tubes and labeled them, and then placed the tubes in biohazard bags. The bags were labeled with a laboratory-request form that included a chain-of-custody receipt. Dr. Pless testified that he saw his autopsy assistant, Gustave Etame, place the containers in the locked refrigerator in the morgue. Dr. Pless further stated that Etame "would have taken" the samples out of the refrigerator the following day, but he acknowledged that he did not see Etame do so. Etame was not present and he did not testify.
Birge's voir dire questioning of Dr. Pless then continued:
 "[Defense counsel:] So that is one person [Etame] who is missing from this chain of custody. Secondly, once he took that sample, where did he take it?
 "[Dr. Pless:] He passes that on [to] the [AIT] Laboratory courier who takes it directly to the laboratory and to the analyst.
 "[Defense counsel:] Who was the courier?
 "[Dr. Pless:] I have no idea who the courier was that day.
 "[Defense counsel:] Okay. Once it was taken into the laboratory, who received it at the laboratory?
 "[Dr. Pless:] It was received by the analyst and logged in for analysis.
 "[Defense counsel:] Who was the analyst who received it?
 "[Dr. Pless:] Well, I just don't happen to know that.
 "[Defense counsel:] Do you know who the — was this analyst who received it and logged it in the actual person who performed the full analysis on all specimens?
 "[Dr. Pless:] Ordinarily it is, yes.
 "[Defense counsel:] But you don't know in this case?
 "[Dr. Pless:] I don't have the chain-of-custody form and all of the people who signed it. That is available at the AIT laboratory.
 "[Defense counsel:] But you don't have that here with you today?
 "[Dr. Pless:] No.
 "[Defense counsel:] . . . Do you know what method and techniques for analysis were used? Was the analysis the simple color changing kits or was it — was gas chromaspecity [sic] used? What was used?
 "[Dr. Pless:] Well, the — there are a number of different analyses done. There is a gas chromatography, which is used for alcohol analysis. The specimens are — blood specimens are converted into serum and the serum is injected directly in the [gas chromatograph].
 "[Defense counsel:] Would a person other than the analyst who received the material in the lab be the person who withdrew the serum? Would there be somebody else who withdrew the serum? *Page 1091 
 "[Dr. Pless:] Well, you have to understand that [an] analytical toxicology laboratory operates with a number of people, so there may be a number of people handling certain specimens. The routine is to try to keep the cases isolated so that individual cases are being done either in batches or by a number of different technicians.
 "[Defense counsel:] The reason for that — and correct me if I'm wrong. The reason why you want some sort of isolation is to prevent cross-contamination?
 "[Dr. Pless:] That's correct.
 "[Defense counsel:] Because cross-contamination occurs, such as the wrong vile was analyzed, or a drop of serum from one vile gets into another vile it can greatly affect the findings of the toxicology analysis; correct?
 "[Dr. Pless:] It could."
(R. 580-83; emphasis added.)
Birge's voir dire questioning of Dr. Pless continued:
 "[Defense counsel:] . . . Who calibrated those instruments before and after the analysis?
 "[Dr. Pless:] Well, I don't know that obviously, because I don't run that laboratory.
 "[Defense counsel:] Yes, sir. So basically there are a number of people who handled these specimens that we don't know and there are a number of people that are in this chain of custody that we don't know about and we [do] not know specifically what analyses were done and whether the machines that did these analyses were properly calibrated?
 "[Dr. Pless:] Well, there are a number of people who handle these specimens and one of the reasons we have inspection and accreditation processes, one of the reasons that we've established quality assurance in laboratories is to make sure that those kinds of mistakes that you're alluding to in terms of chain of custody don't happen. Those inspections and accreditation processes guarantee that. . . .
 ". . . .
 "[Defense counsel:] What happened to these specimens? Who analyzed them?
 "[Dr. Pless:] They went to the American Institute of Toxicology Laboratory and they were analyzed in a routine fashion, just as all of our specimens are on a daily basis and have been done by the AIT Laboratories over the last five or six years.
 "[Defense counsel:] We don't have the names of any of those individuals here today?
 "[Dr. Pless:] No, but I can certainly get them for you."
(R. 584-86; emphasis added.)
Birge asked Dr. Pless about whether embalming fluid in the chest might have tainted the toxicology results, and Dr. Pless acknowledged, "There are many ways that results can be tainted. That's just one." (R. 592.) Dr. Pless also stated that he had no firsthand knowledge about what happened to the samples after they left his laboratory, "I didn't follow this specimen as it moved along." (R. 593-94.)
At the conclusion of the voir dire questioning of Dr. Pless, Birge argued that, without proof of the chain of custody for the body and without proof of the chain of custody on the fluids analyzed at the AIT lab, the evidence was unreliable. She further argued that the State had failed to make the necessary threshold showing of who performed the toxicological analyses and what techniques were used. She also argued that the State had failed to establish that when the autopsy was performed, the body was in substantially the same condition as when Cecil died. The trial court overruled Birge's objections.
The trial court then asked the prosecutor, "[n]ow, are you going to come back, as *Page 1092 
far as the body, are you going to have some —" (R. 599.) The prosecutor stated: "Yes, sir." The trial court then stated: "Then I'm going to allow it conditionally." Birge argued that the State could not prove a full chain of custody for Cecil's body because several people handled the body after Cecil died and it was unattended for periods of time. The judge, paraphrasing the title to the Code section, then noted that § 12-21-13, Ala. Code 1975, provides that "`[p]hysical evidence is not precluded from the jury or the court because of a break in the chain of custody.'" (R. 602.) Birge argued that the statute did not apply in this case, because the body was substantially changed by the embalming process before the toxicology tests were conducted. The court replied, "I understand what your argument is and I think you can do that with your expert as to how it affected it, but what I'm talking about, I thought you were attacking the chain of custody." (R. 603-04.) The court then ruled that the objection to the chain of custody went to the weight of the evidence and that Dr. Pless could testify. Finally, the court told Birge that she could have a standing objection to the chain of custody.
Dr. Pless then testified before the jury about the substances found in Cecil's body. That testimony was based solely on an unsigned report from the AIT lab, which was included with Dr. Pless's autopsy report and introduced into evidence as State's Exhibit 1. When the prosecution offered State's Exhibit 1 into evidence, Birge stated that she had no objection other than the standing objection which, as noted above, was to the chain of custody.
With the foregoing circumstances in mind, we examine the principles regarding proof of the chain of custody of evidence. The Alabama Supreme Court has established the chain-of-custody analysis to be applied:
 "This opinion sets forth an analysis to be followed in deciding whether a proper chain of custody has been shown. We have held that the State must establish a chain of custody without breaks in order to lay a sufficient predicate for admission of evidence. Ex parte Williams, 548 So.2d 518, 520 (Ala. 1989). Proof of this unbroken chain of custody is required in order to establish sufficient identification of the item and continuity of possession, so as to assure the authenticity of the item. Id. In order to establish a proper chain, the State must show to a `reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.' McCray v. State, 548 So.2d 573, 576
(Ala.Crim.App. 1988). Because the proponent of the item of demonstrative evidence has the burden of showing this reasonable probability, we require that the proof be shown on the record with regard to the various elements discussed below.
 "The chain of custody is composed of `links.' A `link' is anyone who handled the item. The State must identify each link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to each link's possession of the item: `(1) [the] receipt of the item; (2) [the] ultimate, disposition of the item, i.e., transfer, destruction, or retention; and (3) [the] safeguarding and handling of the item between receipt and disposition.' Imwinklereid, The Identification of Original, Real Evidence, 61 Mil. L.Rev. 145, 159 (1973).
 "If the State, or any other proponent of demonstrative evidence, fails to identify a link or fails to show for the record any one of the three criteria as to each link, the result is a `missing' link, and *Page 1093 the item is inadmissible. If, however, the State has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the `link,' as to one or more criteria or as to one or more links, the result is a `weak' link. When the link is `weak,' a question of credibility and weight is presented, not one of admissibility."
Ex parte Holton, 590 So.2d 918, 919-20 (Ala. 1991) (emphasis added). The Alabama Supreme Court and this Court have consistently cited and relied on Ex parte Holton for its statement of the principles establishing the legal requirements for proving a proper chain of custody. See, e.g.,Hale v. State, 848 So.2d 224, 229-30 (Ala. 2002);Kennedy v. State, 690 So.2d 1222, 1223-24 (Ala. 1996);Ex parte Slaton, 680 So.2d 909, 918 (Ala. 1996);Harrison v. State, 869 So.2d 509, 520 (Ala.Crim.App. 2002); Lee v. State, 898 So.2d 790, 846-47
(Ala.Crim.App. 2001).
 A. Chain of custody for the body
Birge argued at trial, and she argues again on appeal, that the State failed to establish a proper chain of custody for Cecil's body. She argues, specifically, that the State failed to identify who transferred the body to the funeral home and who handled the body within the funeral home, and that it failed to provide any evidence as to how the body was transferred to Indiana. However, the State had no burden to prove the chain of custody until it seized the body.
 "Proper analysis of a chain of custody question, however, does not begin at the time of the offense; the chain of custody begins when [an] item of evidence is seized by the State. State v. Conrad, 241 Mont. 1, 785 P.2d 185 (1990); 29A Am.Jur.2d, Evidence § 947 (1994 ed.) ('The chain-of-custody rule does not require the prosecution to account for the possession of evidence before it comes into their hands.'). Anyone who has handled evidence in the State's possession is a `link' in the chain of custody; once the evidence is in the State's possession, it is the State's duty to account for each link. § 12-21-13, Code of Alabama (1975). See, Ex parte Holton, 590 So.2d 918, 920
(Ala. 1991)."
Burrell v. State, 689 So.2d 992, 995-96
(Ala.Crim.App. 1996).
The State initiated its investigation into Cecil's death after he had been buried in Indiana, and it had no contact with or control over Cecil's body until it was exhumed.[2] Sheriff Blakely testified that he was present during the exhumation and that he observed the casket being loaded, unopened, into a van for transport to the Indiana University School of Medicine. He testified that he, Investigator Smith, and the Deputy District Attorney Jones followed the van when it left the cemetery, and that the three of them unloaded the casket and carried it into the elevator and up to the morgue. Sheriff Blakely was present when the casket was opened, and he remained in the room while Dr. Pless performed the autopsy.
Thus, the State established the proper chain of custody of the body once the body was seized by the State. Sheriff Blakely adequately testified about the receipt and disposition of the body, and he indicated that the casket was not opened at the cemetery but only at the morgue when Dr. Pless prepared to conduct the autopsy, *Page 1094 
thus indicating the safeguarding and handling of the body. Dr. Pless, the next "link" in the chain of custody, testified about his receipt and handling of the body. Thus, the State adequately established the chain of custody for Cecil's body because, contrary to Birge's arguments, its burden to establish the chain of custody did not begin while the body was in Alabama, but only when it seized the body when it was exhumed in Indiana.
 B. Chain of custody for samples removed from the body
During voir dire examination, Dr. Pless testified that during the autopsy he withdrew certain samples from the body, placed the samples in tubes, and labeled the tubes. Dr. Pless also testified that he observed his autopsy assistant, Gustave Etame, place the samples in the locked refrigerator in the morgue. Dr. Pless testified that Etame "would have taken those samples out of the refrigerator . . . on the day following the autopsy, which would have been the 26th," and he would have passed it on to the courier from the laboratory. (R. 580.) The foregoing is the only testimony in the record before us as to the chain of custody of samples taken from Cecil's body. Nonetheless, Dr. Pless was permitted to testify about toxicology results contained in an unsigned report from the laboratory where the samples were to have been transferred for analysis; that report was attached to Dr. Pless's autopsy report. The document purports to be a report of the analysis of samples from Cecil's body because the report contains Cecil's name; Dr. Pless's autopsy report and the toxicology report contain the same autopsy number. The toxicology report is dated June 12, 2001. In the information beneath Cecil's name the report states, "Date Received," which appears to indicate that the samples were received in the laboratory on May 29, 2001; Dr. Pless testified that he conducted the autopsy on May 25, 2001.
As noted above, to establish a proper chain of custody, Alabama law has consistently required the identification of each "link" in the chain, and with regard to possession of the evidence by each "link," the testimony must include three points: "`(1) [the] receipt of the item; (2) [the] ultimate disposition of the item, i.e., transfer, destruction, or retention; and (3) [the] safeguarding and handling of the item between receipt and disposition.'" Ex parte Holton, 590 So.2d at 920, quoting Imwinklereid, The Identification of Original, RealEvidence, 61 Mil. L.Rev. 145, 159 (1973). The Alabama Supreme Court further stated in Ex parte Holton, "If the State, or any other proponent of demonstrative evidence, fails to identify a link or fails to show for the record any one of the three criteria as to each link, the result is a`missing' link, and the item is inadmissible."590 So.2d at 920 (emphasis added).
The chain of custody for the samples removed from Cecil's body contains several missing links; the chain of custody is so deficient in this case that we are unable to identify precisely how many people handled the samples Dr. Pless removed from Cecil's body. This is significant because Dr. Pless testified that a number of people would have handled the samples. We can infer from the record that a courier transported the samples, but we are uncertain of the date of the transfer because Dr. Pless conducted the autopsy on May 25, 2001, and testified that the samples would have been transferred to the lab the following day, but the samples were apparently not received by the analyst or analysts until May 29, 2001.[3] We *Page 1095 
would expect that someone at the laboratory received the samples and catalogued them into a tracking system; that the person who received the samples would have placed them in a secure, temperature-controlled location until the analyst or analysts retrieved the samples for testing; that the analyst or analysts would have picked up the samples from the secure location and would have safeguarded them during the testing process to ensure that the samples were not contaminated or that the reliability of the test results was not otherwise compromised. However, all of the foregoing are matters of pure speculation because the State failed to establish the chain of custody for the samples after Dr. Pless's assistant placed them in the refrigerator. The State failed to identify any of the links who handled the evidence after Etame secured it, and it therefore could provide no information about the receipt, disposition, and safeguarding and handling of the evidence, all of which are required by Ex parte Holton. Without this necessary information, the State's chain of custody has several missing links,[4] and missing links, the Alabama Supreme Court has said, render evidence inadmissible.
The evidence for which the State failed to establish a proper chain of custody was the crux of the State's case. The toxicology evidence presented the only proof that Cecil did not die of natural causes, as had been initially believed. Only the toxicology results established that Cecil died of a multiple-drug overdose, and that evidence allowed the jury to conclude that the State presented sufficient proof that Birge had murdered her husband. If the toxicology report had not been admitted, Dr. Pless could have testified about the results of his own observations from the autopsy, but he would not have been able to testify about the drugs discovered in Cecil's system, nor would he have been able to testify that the cause of death was a multiple-drug overdose.
In Lee v. State, 748 So.2d 904 (Ala.Crim.App. 1999), overruled in part on other grounds, Pruitt v. State,954 So.2d 611 (Ala.Crim.App. 2006), we reversed a conviction as a result of missing links in the chain of custody. Lee was convicted of unlawful distribution of a controlled substance following a drug sale to an undercover agent. The testimony at Lee's trial established that the crack cocaine was delivered by the undercover agent, David Larimer, to a second agent, Mike Gulledge, who delivered it to drug chemist Kelly Cannon at the Alabama Department of Forensic Sciences for testing. The individuals who handled the evidence were identified, but "[t]his is essentially all of the testimony contained in the record concerning the chain of custody . . . in this case."Lee, 748 So.2d at 911. We reversed the conviction and stated:
 "In the instant case, there were clearly missing links in the State's chain of custody. There is no evidence, either direct or circumstantial, reflecting what Larimer did with the substance he purchased from Lee or reflecting how Larimer handled and safeguarded the substance while it was in his possession before it was delivered to Gulledge. There was no evidence reflecting that the substance was ever sealed in an evidence envelope or safeguarded in any way by Larimer. There is no evidence, *Page 1096 
either direct or circumstantial, reflecting what Gulledge did with the substance while it was in his possession or how Gulledge handled or safeguarded the substance while it was in his possession. There is no evidence reflecting that the substance was ever sealed in an evidence envelope or safeguarded in any way by Gulledge. Moreover, Cannon did not state that the substance was in a sealed condition when she received it. Her testimony reflected only that she sealed the envelope the evidence was in after she completed her testing. To re-iterate, there is no testimony reflecting where the substance was kept or how it was kept before it was presented to Cannon. Nor was there any evidence that when the substance was received at the lab it was packaged so as to be tamper-resistant.
 "In Ex parte Cook, 624 So.2d 511 (Ala; 1993), the Alabama Supreme Court held that a link in the chain of custody of certain evidence (cigarette butts and socks) was missing even though Birmingham police officer Belinda Weldon testified that she had directed another officer to collect the evidence and had watched the officer collect it. The Alabama Supreme Court held that the evidence was inadmissible because `the State did not establish when these items were sealed or how they were handled or safeguarded from the time they were seized until [Phyllis] Rowland[, a forensic serologist at the Alabama Department of Forensic Sciences] received them.' 624 So.2d at 514. The Alabama Supreme Court said that the evidence in question `was inadmissible under Holton.' 624 So.2d at 514. Thus, in Lee's case, as in the Cook case, the State failed to show for the record each `"of the three criteria as to each link[; thus,] the result is a `missing* link, and the item is inadmissible."' Harrison v. State, 650 So.2d 603, 605 (Ala.Cr.App. 1994) (quoting Ex parte Holton, 590 So.2d 918, 920
(Ala. 1991)).
 "Moreover, this is not a case where a witness specifically identified the evidence and where the condition of the evidence was not an issue in the case. Section 12-21-13, Ala. Code 1975 provides:
 "`Physical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration by a jury or court due to a failure to prove the chain of custody of the evidence. Whenever a witness in a criminal trial identifies a physical piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper. The trial court in its charge to the jury shall explain any break in the chain of custody concerning the physical evidence."
 "In Land v. State, 678 So.2d 201
(Ala.Cr.App. 1995), aff'd, 678 So.2d 224 (Ala. 1996), a case which appears to rely on § 12-21-13, this court ruled that where a witness can specifically identify the evidence, and its condition is not an issue in the case, then the State is not required to establish a complete chain of custody in order for the evidence to be admitted into evidence. We stated: `The eyeglasses were admissible without establishing a chain of custody because [the testifying officer] was able to specifically identify them, and their condition was not an issue in the case.' Land, 678 So.2d at 210. However, the Land opinion distinguished Cook stating:
 "`The State was required to establish a complete chain of custody for the cigarette butts and socks collected at the scene of the homicide in Ex parte Cook, 624 So.2d 511 (Ala. 1993), *Page 1097 
but not for the eyeglasses collected at the scene of this homicide because the items in Cook, unlike the eyeglasses here, were subjected to scientific analysis and their condition was at issue.'
 "Land v. State, 678 So.2d at 210.
 "The evidence in Lee's case cannot be admissible under § 12-21-13, Ala. Code 1975, because no witness directly testified at trial that the substance tested by Cannon was the same substance Lee had sold to Larimer. Moreover, the condition of the substance, i.e., whether it was a cocaine, was the crux of the case. Therefore, because there were missing links in the chain of custody, the trial court erred in admitting the substance into evidence over Lee's chain-of-custody objection."
748 So.2d at 912-13.
In Lee, each person who handled the evidence was identified; here, we have no information identifying anyone who handled the samples in this case after Dr. Pless saw Etame put them in the refrigerator. Although Dr. Pless testified that he placed the samples in tubes and labeled them, then placed the tubes in biohazard bags, we have no testimony — direct or circumstantial — indicating the condition of the evidence when it was received at the lab, and we have no evidence as to the manner in which the samples were handled or safeguarded after the samples were placed in the refrigerator on May 25. Thus, as in Lee, the State failed to present testimony about the safeguarding and handling of the evidence. This deficiency is compounded by the State's failure to identify many of the links in the chain.
We note, additionally, that Dr. Pless's testimony created some discrepancy regarding the handling of the evidence, because he stated that the samples would have been transferred on May 26, yet the toxicology report indicates the samples were received on May 29, leaving a gap of several days when the whereabouts of the crucial evidence are unknown. While we could surmise that Dr. Pless was mistaken about the date of transfer, and we could infer that a courier picked up the samples on the next working day after the Memorial Day holiday, it would be wholly inappropriate for us to engage in such surmise and inference, because this is precisely the type of testimony that the State should have presented to establish the chain of custody for the samples. Thus, as in Lee, the State failed to prove a complete chain of evidence for the crucial toxicology evidence, and the trial court erred to reversal when it allowed Dr. Pless to testify to the results of the toxicology analysis.
The Alabama Supreme Court reached a similar conclusion in a civil case, Green v. Alabama Power Co., 597 So.2d 1325
(Ala. 1992). Curtis Green was electrocuted when he came into contact with a high-voltage line owned by Alabama Power Company ("APCo") while he was moving a building on a truck through the Town of Slocomb. During the trial on the wrongful-death case filed by Mrs. Green, the administratrix of Curtis Green's estate, APCo asserted that Green contributed to his death and offered evidence indicating that he had cocaine in his system at the time of his death. At trial and on appeal, Mrs. Green argued that the defendants failed to establish an unbroken chain of custody. The Alabama Supreme Court agreed. We quote a substantial portion of the Court's analysis in Green, because many of the inadequacies in the chain of custody in that case are similar to those we have identified here:
 "`A showing that there was no break in the chain of custody is required to establish a sufficient predicate for admission into evidence. Ex parte Yarber, 375 So.2d 1231 (Ala. 1979), reversed on other grounds, 437 So.2d 1330 (Ala. 1983). The identification of *Page 1098 
the evidence and continuity of possession must be sufficiently established in order to assure the authenticity of the item, Ex parte Yarber, supra.
 "`This state employs two separate standards for testing the chain of custody — the weak link test announced in Sommer v. State, 489 So.2d 643 (Ala.Crim.App. 1986), and the missing link test announced in Mauldin v. State, 402 So.2d 1106 (Ala.Crim.App. 1981).
 "`Where a weak link in the chain of custody is found, the weight and credit afforded the evidence, rather than its admissibility, [are] questioned. Sommer, supra. Where a break in the chain of custody, or a "missing link" in the chain of custody is shown, the admissibility of the evidence is questioned, Mauldin, supra.'
"Ex parte Williams, 548 So.2d 518, 520 (Ala. 1989) (emphasis in original).
"In this case, evidence regarding the drawing and disposition of the samples of body fluids was provided by Dr. Perades [of the Alabama Department of Forensic Sciences] and Ms. Shevlin [a toxicologist]. Because we conclude that a break in the chain of custody of the samples appears in the record in connection with Dr. Perades's preshipment procedures, we set out intoto those portions of his testimony regarding his role in the disposition of the samples.
 `"Q. [Counsel for APCo] I noticed from looking at your report that you submitted some evidence to the Department of Forensic Sciences in Auburn at that laboratory, is that correct?
 "`A. Yes, sir.
 "`Q. Did you take any samples from the body of Mr. Curtis Green?
 "`A. Yes.
 "`A. I removed eye fluid, bile, and urine.
 "`Q. And did you submit those samples to the Department of Forensic Sciences in Auburn in containers provided and used by the State of Alabama?
 "`A. Yes.
 "`Q. And you sent the samples to Auburn, is that correct?
 "`A. Yes, sir.
 "`Q. Why did you send those samples to Auburn?
 "`A. That's our toxicology lab in Auburn for this area.
 "`Mr. Cobb: I believe that's all.
 ". . . .
 `"Q. [Counsel for Mrs. Green] Dr. Perades, you said that various samples were taken and sent to Auburn?
 "`A. Yes, sir.
 "`Q. Who drew those?
 "`A. I did[.]
 "`Q. You, yourself, drew them?
 `"A. Yes.'
"(Emphasis added.) As the record indicates, the only evidence regarding the manner in which the samples were handled in preparation for shipping was provided in response to a leading question by counsel for APCo on direct examination.
"The defendants then called Ms. Shevlin, who was on the receiving end of the shipment. She provided the following testimony:
 "`Q. [By counsel for APCo] All right. Ms. Shevlin, did you receive at the Department of Forensic Sciences lab in Auburn containers that were labeled as being the blood and urine specimens of Curtis Green?
 "`A. Yes. I received a plastic bag which contained specimens of blood, the eye fluid, bile, and urine, each *Page 1099 
labeled as being that of Curtis Green and with the case number.
 "`Q. With the case number?
 `"A. Right.
 "`Q. And was that case number the case number assigned by the Department of Forensic Sciences in Dothan?
 `"A. Yes.
 "`Q. And by what means did you receive those plastic bags?
 "`A. They were received in a styrofoam carton sealed inside a cardboard carton; it was a unit that comes that way. They were shipped by U.P.S. and received at our lab in a sealed cardboard container.
 "`Q. Anywhere on that package did it indicate where the containers and where the samples had been sent from?
 "`A. No. Normally, U.P.S. removes a portion of their mailing label at the time of delivery, so, we don't actually see that part of it, but the paperwork that I have here was inside the box.
 `"Q. What did the paperwork reveal?
 "`A. The paperwork indicated — was signed by Dr. Perades indicating shipment by U.P.S. on June 7, 1988.
 "`Q. What date did you receive those samples?
 "`A. I received them June 8, 1988, at 9:30 in the morning.
 "`Q. And is that the customary and normal handling or way that the Department of Forensic Sciences handles the shipment of body fluids such as blood and urine from one lab to the other?
 "`A. This is the way that we handled it between the Dothan lab and the Auburn [lab] for several years now.
 "`Q. Was the container that you received these samples in, in any way damaged before you opened it?
 "`A. Not from my observation, no.
 "`Q. Did it look like it had been tampered with in any way since the time it was shipped from Dothan?
 "`A. No.
 "`Your Honor, I've laid the predicate [for admission of the toxicology report].
 "`Q. [Cross-examination by counsel for Ms. Green] Ms. Shevlin, you know it was received at your lab in the sealed container?
 "`A. Yes.
 "`Q. And you know it was properly taken care of at your lab?
 "`A. Well, I would have been the one that opened it.
 "`Q. And there is no question about that, but you don't know what happened before that time do you?
 `"A. No.
 "`Q. As to who put it in that container?
 "`A. No, I don't.
 "`. . . .
 "`Q. As to who turned it over to U.P.S.?
 "`A. No.
 `"Q. As to the procedure whereby U.P.S. received it?
 "`A. No. That information might be available from one of the people through the Dothan lab but I don't have it.
 "`Q. Or where it might have been — the state of the substances from the time they were taken and the time they were put in the hands of U.P.S.? You don't know that either, do you?
 "`A. No. I know that the Dothan lab submits their specimens inside the cardboard boxes and that they do send cooling packs in the boxes also.
 "`Q. But as far as between the time it was taken and the time it was *Page 1100 
turned over to U.P.S., you don't have any personal knowledge of that? `"A. No.'
"(Emphasis added.)
"Information absent from Dr. Perades's testimony was not supplied by the testimony of Ms. Shevlin. On the contrary, the package that she received contained samples not only of eye fluid, bile, and urine, but of blood. Thus, her testimony not only failed to supply vital information missing from Dr. Perades's account of the preshipment
disposition of the samples, but, also injected an additional element of uncertainty.
"In support of their contentions that the evidence was admissible, the defendants cite Snowden v. State,574 So.2d 960 (Ala.Crim.App. 1990), and Moorman v. State,574 So.2d 953 (Ala.Crim.App. 1990). In Snowden, the alleged break in the chain of custody of biological samples extracted from a rape victim and her alleged assailant occurred under the following circumstances:
 "`Elaine Scott [forensic serologist] received [in Mobile] two sealed "packets" from Officer Jean White [in Fair-hope] on July 28. Sometime later (the record does not indicate when), Ms. Scott broke the seals, opened both packets, and performed several tests on the specimens. Ms. Scott detected the presence of semen on two vaginal swabs, on the panties, and on a pair of shorts collected from the victim. She made a cutting from the panties, stapled it to a card, and sealed it. She then reseated the packet containing the shorts, other items from the victim's rape kit, and samples that had been collected from the defendant. All these materials were packaged for shipment to Lifecodes Corporation in New York.
 "`Ms. Scott did not remember whether she personally had packaged the materials for shipment after sealing them, or whether one of her assistants had done so at her direction. She testified that the package was "picked up at the laboratory by either Federal Express or United Parcel Service." There was no testimony regarding the date on which the package was shipped.
 `"On August 11, Chris Aird, the evidence technician at Lifecodes Corporation, received a package shipped by United Parcel Service ("UPS") "next day air" service from Elaine Scott. . . . The items he examined corresponded exactly to the items Elaine Scott had placed in the package.'
"Id. at 961-62 (emphasis added). The Court of Criminal Appeals concluded that the totality of the circumstances' sufficiently established the `continuity' of the chain of custody and the `integrity' of the procedure. Id. at 963.
"In Moorman, it was alleged that the following circumstances constituted a break in the chain of custody of a blood sample drawn from the defendant charged with vehicular homicide:
 "`The injured defendant was taken to the East Alabama Medical Center. Wanda Johnson, a registered nurse on duty in the emergency room, testified that between 3:30 and 4:00 that after-noon she simultaneously drew at least three blood samples from the defendant for "diagnostic purposes" and for "legal purposes." Each sample was placed in a prepackaged tube and each tube had a different colored top. . . . She did testify that she sealed each tube and identified each sample with the defendant's name and hospital number. She then gave one sample to Opelika police detective John Richardson. She gave the other samples to the "unit secretary to be sent *Page 1101 
to the lab." She testified that "[s]omebody from the lab picked it up." Johnson testified that tests for the emergency room were "automatically done stat [as soon as possible.]." Neither the unit secretary nor the person from the laboratory who picked up the sample testified at trial.
 "`Jane Trip was the "toxicology coordinator" for the hospital laboratory. . . . She tested the one sample of the defendant's blood she received from "laboratory personnel." This sample had a red and grey speckled top and appeared to be "intact." She testified that the information on the sample container indicated that the sample had been taken at 3:30 p.m.'
 "Moorman, 574 So.2d at 954-55. Notwithstanding the fact that `two "links" in the chain of custody did not testify and were only generally identified as a unit secretary and a person from the laboratory,' the Court of Criminal Appeals found that the `totality of the circumstances . . . established] a reasonable probability of the identity of the blood sample and the integrity of the continuity of possession.' Id. at 956.
 "The factual distinctions between those cases and the one under consideration are apparent. Unlike the record in Moorman, which indicated precisely when the blood samples were taken, the record in the case before us merely reveals a four-day period, any part of which could have constituted the time of the extraction. Unlike the records in Snowden and Moorman, which set forth in detail the procedures employed in labeling and sealing the individual samples, the record in this case reveals only that Dr. Perades `submitted] those samples to the Department of Forensic Sciences in Auburn in containers provided and used by the State of Alabama.' It reveals nothing whatever of the procedures employed in drawing the samples, whether or when the samples were sealed, or when they were labeled and shipped. Finally, unlike Moorman, which involved a very short time span between the drawing and the testing of the samples, this case involves an interval of undetermined duration spanning, perhaps, several days. The interval between the sealing, labeling, and shipping of the samples involved in Snowden
was also of uncertain duration; however, unlike the discrepancy involved in this case, the items that arrived in New York `corresponded exactly' to those that Elaine Scott had packaged. We find no support, therefore, in those cases for the defendants' contentions.
 "In chain-of-custody cases involving `specimens taken from the human body,' the proponent of the evidence must demonstrate `"where and by whom the specimen was kept and through whose hands it passed." J. Richardson, Modern Scientific Evidence, Section 13.14a (2d ed.1974). Gothard v. State, 452 So.2d 889, 890 (Ala.Cr.App.), cert. stricken, 450 So.2d 479 (Ala. 1984).' Suttle v. State, 565 So.2d 1197, 1199 (Ala.Crim.App. 1990) (reversing vehicular homicide conviction for failure of prosecution to account for blood sample during four-day interval between delivery of unsealed sample to police officer and reception at laboratory). If `"the substance analyzed has passed through several hands the evidence must not leave it to conjecture as to who had it and what was done with it between the taking and the analysis." Rodgers v. Commonwealth, 197 Va. 527, 90 S.E.2d 257, 260
(1955) (emphasis added).' Suttle, 565 So.2d at 1199.
 "As Mrs. Green correctly observes, if Dr. Perades drew the samples on June 4, the day of the accident, a significant and unexplained period of time intervened before the shipment arrived in *Page 1102 
Auburn on June 8, 1988. That fact, coupled with the patent discrepancy in the testimony regarding the content and substance of the samples, leads to conjecture as to whether the samples received in Auburn were, indeed, those taken in Dothan from the body of the decedent, Curtis Green. We, therefore, are not confronted by a chain of custody comprised of `weak links,' but by a chain from which links are entirely missing. Ex parte Williams, 548 So.2d 518, 520 (Ala. 1989)."
 "Over Mrs. Green's continuing objection, the trial court admitted highly prejudicial evidence regarding the results of the toxicological tests performed on the samples purportedly taken from Curtis Green's body. We conclude that the trial court abused its discretion in admitting the evidence."
Green, 597 So.2d at 1328-32.
As in Green, the case before us presents missing links from the chain of custody for evidence that was crucial to prove the State's case. Although the State contends that the chain it presented has only weak, not missing, links, that argument is not persuasive. The record before us contains no testimony identifying anyone who handled the evidence after it was placed in the refrigerator. Thus, not only does the record lack the necessary testimony about the receipt, disposition, and safeguarding by those who handled the evidence, it lacks the very identification of those individuals who came into contact with it after Dr. Pless gave it to Etame. Importantly, there is no testimony from the analyst who received the evidence indicating what evidence was received, when it was received, or that it was received in a sealed package that appeared not to have been tampered with. There is simply no evidence to prove who handled the samples extracted by Dr. Pless from Cecil's body, that those samples were safeguarded before they were analyzed, or that the samples were, in fact, the ones removed from Cecil's body. Contrary to the State's assertions at oral argument, the fact that Dr. Pless had general knowledge of the procedures used at the AIT lab could not satisfy the requirements of Ex parte Holton that the State identify the links and provide testimony about the receipt, disposition, and safeguarding of the evidence. Nothing in Alabama caselaw permits such speculative and generalized testimony to satisfy the requirements to prove the chain of custody. Nor can this Court engage in conjecture to fill in large gaps in the State's inadequate chain of custody.
We note, additionally, that an element of uncertainty about the samples exists in the record before us, as it did inGreen. Dr. Pless testified on direct examination only that he extracted samples from Cecil's body, but he did not further identify precisely what samples he extracted. The autopsy report prepared by Dr. Pless included a section entitled "SPECIMENS FOR TOXICOLOGY" and it listed four items: "Blood clot from the heart for volatiles and urine from the bladder for drugs of abuse. Vitreous and bile for drugs." (State's exhibit # 1, p. 8 of autopsy report.) The toxicology report on which Dr. Pless relied and about which he was permitted to testify, however, indicated that five samples were received: urine, bile contents, gastric contents, vitreous fluid, and fluid from the right chest. (State's exhibit # 1, p. 1 of toxicology report.) On voir dire examination, Dr. Pless testified that he placed the samples in tubes. (R. 579.) The toxicology report, however, indicates that the urine and chest fluid samples were in bottles when they were received. (State's exhibit # 1, p. 1 of toxicology report.) On cross-examination by Birge about the toxicology findings, Dr. Pless testified that he took five samples from Cecil's body: urine, bile from the gallbladder, blood from chest fluid, gastric contents, *Page 1103 
and vitreous fluid. (R. 635-40.) Only the urine and chest fluid — the two samples in bottles — were analyzed, however, and Dr. Pless stated that the analysis of the blood in the chest fluid was sufficient to make the determinations he needed. (R. 636.) There is no indication in Dr. Pless's autopsy report, however, that he submitted chest fluid for toxicological analysis. These discrepancies are significant because the toxicology report indicated only a "positive" or "negative" result for certain drugs in the urine, while the report of the analysis of the chest fluid included a list of the drugs found and the amounts of the drugs that were found in the fluid. The results of the analysis of the chest fluid allowed the State to argue that Cecil had been murdered and that Birge had prescriptions for the drugs found in Cecil's body. The discrepancies between the autopsy report and the toxicology report introduced another serious question about the integrity and authenticity of the samples that arrived at the lab. This is another significant break in the chain of custody in this case and demonstrates clearly that the requirements of Ex parteHolton were not satisfied.
The State argues that, at most, the chain of custody here contained weak links and points out that testimony from every link in the chain is not required, particularly when there is no evidence indicating that the samples were tampered with or altered before they were examined. Although we acknowledge that testimony from each link is not required to establish a complete chain of custody, see, e.g., Harrison v. State,650 So.2d 603, 605 (Ala.Crim.App. 1994), each link must be identified, and the three criteria set forth in Ex parteHolton must be established or "the result is a `missing link,' and the item is inadmissible." Ex parte Holton,590 So.2d at 920. The Alabama Supreme Court in Ex parteHolton analyzed circumstances that presented a chain of custody with a weak link:
 "At trial, the State presented the following testimony: [undercover officer Yvonne] Bedgood testified that she had received the cocaine from Holton. She testified that she put the cocaine into a plastic bag, which, she said, she put into an envelope. She testified that she sealed the envelope and put her initials on it and then turned the envelope over to Governor Jackson, a narcotics investigator with the Dothan Police Department.
 "Jackson testified that he put tape over the seams of the envelope and that he also initialed the envelope. He further testified that he put the envelope in the police locker, to which only he had access. He testified that he later gave the envelope to Ray Owens, a Dothan police officer, to transport to the forensic laboratory. He stated that the envelope was in the same condition when he gave it to Owens as it was when he placed it in the locker.
 "The next person to testify was Joe Saloom, the director of the forensic laboratory in Enterprise. He testified that he had received the item from Owens and that when he received the envelope, it was sealed. Owens did not testify."
590 So.2d at 919.
The Court explained that Owens's failure to testify did not create a missing link, only a weak link:
 "In this case, Owens failed to testify as to his action regarding the envelope. However, the record reflects his receipt of the item; he received the item from Jackson, who testified that he had given the envelope to Owens. Also, Owens's ultimate disposition of the item appears in the record through the testimony of Saloom, who testified that he received the item from Owens. Therefore, the only criterion left to analyze is the handling and safeguarding by Owens. *Page 1104 
Again, Owens did not testify; thus, there is no direct evidence of his handling of the item. However, both Jackson and Saloom testified that the envelope was sealed when given to and when taken from Owens. A sealed envelope was adequate circumstantial evidence to establish the handling and safeguarding of the item by Owens to treat the item as authenticated. Although the lack of Owens's direct testimony `weakens' the chain, the testimony of Jackson and Saloom prevented a break in the chain. The cocaine was properly admitted by the trial court, and the jury could decide how much weight to give the evidence, given the lack of direct testimony from Owens."
Ex parte Holton, 590 So.2d at 920. See alsoKennedy v. State, 690 So.2d 1222 (Ala. 1996) (lab worker who received drug evidence at the lab did not testify, but all links were identified and all others testified; thus, the chain was weakened, but not broken, and evidence was admissible).
The distinctions between the circumstances of a "weak link" case described in Ex parte Holton and the case before us are substantial. This case is not simply missing direct testimony from one or more links whose handling of the evidence can be established by circumstantial evidence. Rather, this case has an unknown number of missing links because the State failed to identify anyone who handled the evidence after it was placed in the refrigerator following the autopsy, even though Dr. Pless testified that the samples were likely handled by "a number of people" at the lab. (R. 582, 584.) The failure to identify any of those links or to present evidence of the three criteria set forth in Ex parte Holton — receipt, disposition, and safeguarding and handling — leads inescapably to a determination that the State failed to establish a sufficient chain of custody and that the missing links rendered the toxicology report and Dr. Pless's testimony about the report inadmissible at Birge's trial.
The State cites § 12-21-13, Ala. Code 1975, as an alternative ground for finding that no error occurred as a result of Dr. Pless's testimony about the toxicology results. Section 12-21-13 provides:
 "Physical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration by a jury or court due to a failure to prove the chain of custody of the evidence. Whenever a witness in a criminal trial identifies a physical piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper. The trial court in its charge to the jury shall explain any break in the chain of custody concerning the physical evidence."
However, in Hale v. State, 848 So.2d 224 (Ala. 2002), Hale was convicted of unlawful distribution of marijuana and argued on appeal that the State had failed to prove the complete chain of custody. Specifically, he argued that two employees of the Alabama Department of Forensic Sciences who had custody of the evidence bag had failed to testify to the safeguarding and handling of the evidence. The Alabama Supreme Court discussed § 12-21-13, Ala. Code 1975, and initially noted:
 "This statute, by its terms, applies only to `[p]hysical evidence connected with or collected in the investigation of the charged crime. To invoke the statute the proponent of the evidence must first establish that the proffered physical evidence is in fact the very evidence `connected with or collected in the investigation.'"
Hale v. State, 848 So.2d at 228.
The Court also quoted from Lee v. State,748 So.2d 904, 912-913 (Ala.Crim.App. *Page 1105 
1999), a case we discussed above, in which we held that the purported drug evidence was not admissible under § 12-21-13, Ala. Code 1975, because no witness directly testified at trial that the substance tested by the drug analyst was the same substance Lee had sold to the undercover agent, and because the identification of the substance was the crux of the case. The Court then held:
 "Because no witness in the case before us could otherwise identify the content of the inner bag in the evidence bag as marijuana, forensic testing was necessary. Therefore, § 12-21-13 does not apply to eliminate the need of the State to prove an unbroken chain of custody of the evidence bag and its contents."
Hale v. State, 848 So.2d at 229.
In this case, we have no testimony from the analyst who performed the tests, so we certainly have no testimony establishing that the samples were in the same condition when they were tested, days after they were extracted from Cecil's body and after they were handled by other individuals who are not identified in the record. Moreover, as noted previously in this opinion, the autopsy report and the toxicology report contain discrepancies that give rise to concerns about whether the samples tested were those collected by Dr. Pless. Thus, as in Lee and Hale, § 12-21-13 did not eliminate the State's obligation to prove a complete chain of custody for the toxicology evidence.
Based on our review of Alabama law and of the evidence presented in this case, we must conclude that the State failed to satisfy its burden to prove a sufficient chain of custody for the samples extracted from Cecil's body and that the trial court erred when it admitted the toxicology report and permitted Dr. Pless to testify from that report. As a result of the error, highly prejudicial evidence — the very crux of the State's case against Birge — was erroneously admitted over Birge's repeated objections. We do not reverse a capital-murder conviction lightly. However, on the record before us, we have no alternative but to reverse Birge's capital-murder conviction and remand the cause for a new trial.[5]
 II.
In Issue VIII of her brief, Birge argues that the trial judge committed reversible error when, in response to a question from the jury that indicated it could not reach a verdict, he entered the jury room and apparently instructed the jurors to continue their deliberations. Birge contends that she was denied her right to be present when the trial court gave the additional instruction to the jury outside her presence. Birge has failed to preserve this issue for our review because she did not first raise this objection in the trial court.
It is well settled that, in order to preserve an issue for appellate review, a timely objection must be made in the trial court, and the court must enter an adverse ruling. For example, in Calhoun v. State, 530 So.2d 259 (Ala.Crim.App. 1988), the defendant failed to object when voir dire examination and the striking of the jury took place in his absence, and this Court held that lack of objection precluded appellate review of the issue. In her brief, Birge acknowledges that she and her attorney were in the courtroom when "it was observed that the trial judge walked into the courtroom, walked into the juror deliberation room, and close[d] the door." (Birge's brief at p. 105.) Thus, Birge was well aware of the trial court's actions that she now alleges rose to the level of a *Page 1106 
constitutional violation, and yet she remained silent. The failure to make a timely objection so the trial court could take any corrective action that might have been necessary resulted in a waiver of this issue for purposes of review.
 Conclusion
For the foregoing reasons, we hold that the State failed to establish a sufficient chain of custody for the samples extracted from Cecil's body and submitted for toxicological analysis and that the trial court erred when it admitted the report into evidence as part of the autopsy report. The court also erred when it allowed Dr. Pless to testify about the information contained in the toxicology report and to give his opinions as to the cause of death based on information contained in the toxicology report. We therefore reverse the capital-murder conviction and remand this cause for a new trial on that charge. We affirm the convictions and sentences for second-degree forgery and for first-degree theft.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
BASCHAB, P.J., and McMILLAN and WELCH, JJ., concur.
WISE, J., concurs in the result.
[1] On November 14, 2005, this case was submitted on briefs. On June 7, 2006, the submission was withdrawn and the parties were ordered to present oral arguments on Issue III, and arguments were heard on August 15, 2006. At oral argument, this Court allowed the parties to present supplemental briefs. Both parties submitted supplemental briefs, and the case was resubmitted for decision by this Court on October 31, 2006.
[2] Birge also argues that the State failed to establish that the body was that of Cecil Birge. However, under defense cross-examination, Dr. Pless testified that he did not know Cecil Birge, so he depended on the identification of Cecil by Deputy District Attorney Jones and Sheriff Blakely, and that they did, in fact, identify the body as Cecil's. (R. 616.)
[3] We note that May 25, 2001, was a Friday, and that the following Monday, May 28, 2001, was a national holiday.
[4] The State noted during the oral argument in this case that the chain-of-custody card about which Dr. Pless testified was available to the defense. To the extent the State intended to imply that the burden of proving the chain of custody might shift from the State to the defense, we note that the proponent of the evidence always has the burden of establishing the foundation necessary for its admission. See, e.g., Ex parteHolton, 590 So.2d at 919-20.
[5] Issues I through VII of Birge's brief relate to the capital-murder conviction. Having found that Birge is entitled to a reversal of that conviction and a new trial, we pretermit discussion of the remaining issues related to that conviction.
 *Page 63