962 So.2d 159 (2006)
Ex parte Lernard PHILLIPS.
In re Lernard Phillips
v.
State of Alabama.
1050076.
Supreme Court of Alabama.
August 18, 2006.
Rehearing Denied October 20, 2006.
David K. Hogg of Merrill, Harrison & Adams, Dothan, for petitioner.
*160 Troy King, atty. gen., and Kevin C. Newsom, deputy atty. gen., and John M. Porter, asst. atty. gen., for respondent.
HARWOOD, Justice.
On November 7, 2005, this Court granted Lernard Phillips's petition for a writ of certiorari to review the memorandum affirmance by the Court of Criminal Appeals of the trial court's judgment convicting him of sexual abuse in the first degree. Phillips v. State (No. CR-03-1352, Aug. 19, 2005), 945 So.2d 1096 (Ala.Crim.App.2005) (table). The trial court sentenced Phillips to eight years' imprisonment and ordered him to pay a $5,000 fine, $500 to the Alabama Crime Victims Compensation Fund, and court costs. We granted the writ to determine whether the Court of Criminal Appeals correctly held that the improper admission at trial of evidence of two laboratory tests based upon a type of DNA analysis was harmless error under the standard stated in, among other cases, Ex parte Hutcherson, 677 So.2d 1205 (Ala. 1996).
The summary of the facts set out by the Court of Criminal Appeals in its memorandum affirmance is as follows:
"The State's evidence tended to show that in July 2000, 9-year-old D.M. was living in Webb, Alabama, with her mother, [D.B.], and her two sisters, M.T. and L.B. On July 8, 2000, [D.B.'s] boyfriend, Lernard Phillips, knocked on the door at approximately 3:00 a.m., said that he had been drinking, and asked [D.B.] to get him some food. [D.B.] and 13-year-old M.T. went to Waffle House[, a 24-hour breakfast restaurant], leaving Phillips with D.M. and one-and-a-half-year-old L.B.D.M. testified that while her mother and M.T. were gone, Phillips came into her bedroom, said that he had `something to show [her]' and ordered her to take off her panties. He then climbed on top of her, took out his penis, and tried to force it into her vagina. After three unsuccessful attempts, he got off her and told her not to tell. [D.B.] and M.T. returned from the Waffle House at approximately 3:30 a.m. When M.T. came to bed, D.M. told her what Phillips had done. Later that morning, D.M. told her mother that she no longer liked Phillips. However, she did not say why.
"The following morning, M.T. told [D.B.] during an argument that she should worry about D.M. because D.M. `could have got[ten] hurt.' [D.B.] questioned D.M., and D.M. told her what Phillips had done. D.M. subsequently told police lieutenant Jerry Hunt and DHR child-abuse investigator Barbara Daniels what Phillips had done to her. On July 14, 2000, pediatrician Kenneth Brown examined D.M. and found no physical signs of abuse. Dr. Brown also did blood work to check for herpes and HIV; and he sent swabs to Alabama Reference Labs[, a private testing facility,] to test for gonorrhea and for chlamydia, a sexually transmitted disease that `require[s] some exchange or contact of bodily fluids.' The trial court allowed Dr. Brown to testify, over objection, that the result of the chlamydia test was positive. Dr. Brown said that he prescribed Azithromycin, an antibiotic which was effective against both chlamydia and D.M.'s subsequent ear infection. He also stated, without objection, that D.M. later was seen by Dr. Sester, who performed a test that showed that the chlamydia infection was cured.
"Family practice physician Mark Dean testified that on March 4, 2000, D.M.'s mother had come to him with a complaint of lower abdominal pain and vaginal discharge. He performed a pelvic examination and obtained a pap smear and a sample for a DNA probe *161 test. Dr. Dean testified that the pap test was positive for gonorrhea. He also testified, over objection, that the DNA probe test, which he sent to Alabama Reference Labs, was negative for gonorrhea and positive for chlamydia. Dr. Dean said that he performed the probe test because he suspected from [D.B.'s] symptoms that she had chlamydia.
"The victim's mother testified that the only person she was having sex with in March 2000, was Phillips and that he did not use a condom. The victim's sister, M.T., testified that, when she was 13 years old, Phillips had sex with her approximately five times in her mother's trailer and one time on a dirt road. She also testified, without objection, that she went to the Houston County Health Department in August 2000 with pelvic pain. She said that she was given antibiotics, which cured the condition.
"[Phillips] testified in his own behalf that he had never been diagnosed with chlamydia. He also said that he had been given a blood test for venereal diseases in March 2003 in connection with his military service and that he was not told of any negative result. Phillips said that he arrived at [D.B.'s] trailer between 1:00 and 1:30 a.m. on July 8, that he had not been drinking and that he did not see D.M. at all while [D.B.] and M.T. went to the Waffle House. He denied having sexual contact with D.M. or M.T."
(Emphasis added.)
Additionally, the record reveals that Dr. Brown explained that the swabs he obtained, which tested positive for chlamydia, were from D.M.'s urethra and that the laboratory test performed on them was "a DNA probe," which he described as a more sensitive and reliable test than a conventional culture.
On appeal to the Court of Criminal Appeals, Phillips argued that the trial court committed reversible error by permitting Dr. Brown and Dr. Dean to testify concerning the laboratory reports that indicated that D.M. and her mother had both tested positive for chlamydia. The Court of Criminal Appeals addressed this argument as follows:
"The appellant contends that Dr. Brown and Dr. Dean should not have been permitted to testify about the results of the tests performed by Alabama Reference Labs, for the following reasons: (1) The reports indicating the presence of chlamydia were not properly authenticated or admissible as business records; (2) the doctors were improperly allowed to base their opinions on facts not in evidence or within their personal knowledge; and (3) the State failed to lay a proper predicate for the admission of scientific test results by showing that the DNA analysis used by the lab was reliable and relevant."
The Court of Criminal Appeals agreed that the laboratory test results had not been properly authenticated and that they therefore constituted inadmissible evidence, but it reasoned that the error in their admission could be classified as harmless:
"Although the results of the laboratory tests performed on D.M. and her mother should not have been admitted into evidence, their admission was not so prejudicial that it requires reversal in the present case. A judgment will not be reversed on the ground of improper admission of evidence unless, after an examination of the entire cause, it appears that the error has probably injuriously affected a party's substantial rights. Rule 45, Ala. R.App. P. Here, the victim told her sister what had happened immediately after the incident *162 and told her mother the following day. She repeated this information for a police officer, a child-abuse investigator, and the jury, and the essential elements of her statements remained consistent throughout the period of nearly four years. The testimony of the victim alone is sufficient to establish a prima facie case of sexual abuse. A.B.T. v. State, 620 So.2d 120 (Ala.Crim.App. 1992). In addition, the victim's minor sister testified that [Phillips] had had intercourse with her. The jury could infer from this testimony that Phillips had an unnatural sexual desire for young girls. See § 13A-6-60, Ala.Code 1975, which defines `sexual contact' as a touching done `for the purpose of gratifying the sexual desire' of either party.
"The only medical testimony that was erroneously admitted concerned the two laboratory test results. Dr. Brown properly testified that in July 2000, he tested the victim for sexually transmitted diseases and prescribed an antibiotic. He also stated, without objection, that another doctor later found that the victim's chlamydia was cured. Dr. Dean properly testified that he suspected that the victim's mother had chlamydia in March 2000 because of her symptoms of abdominal pain and vaginal discharge. The victim's sister testified, without objection, that she suffered abdominal pain in August 2000, that she was prescribed an antibiotic, and that she was cured. In light of all the evidence properly offered by the State, the improper admission of the test results was unlikely to affect the jury's decision."
Thus, although the Court of Criminal Appeals determined that the results of the laboratory tests in question had been improperly admitted, it concluded that the admission of those results was not sufficiently prejudicial to warrant the reversal of Phillips's conviction, i.e., that the erroneous admission of the test results was "harmless error" in light of the other evidence presented by the State supporting an inference of Phillips's guilt. We agree with the Court of Criminal Appeals that the two laboratory tests relied upon by Dr. Brown and Dr. Dean lacked the appropriate predicates for admission into evidence so that the admission of their testimony regarding the results of those tests over Phillips's objection was error. We disagree, however, with the conclusion of that court that the error in admitting that testimony was harmless.
In Hutcherson, supra, this Court stated:
"`Harmless error' is defined as `an error which is trivial or formal or merely academic and was not prejudicial to the substantial rights of the party assigning it and in no way affected the final outcome of the case.' Black's Law Dictionary 718 (6th ed.1990). In order to secure a reversal of a judgment, an appellant not only must show error, but also must demonstrate that the error resulted in a substantial injury. Rule 45, [Ala.]R.App.P. Overwhelming evidence of guilt does not render prejudicial error harmless under Rule 45. Ex parte Lowe, 514 So.2d 1049 (Ala.1987)."
677 So.2d at 1209.
The body of proof that convinced the jury of Phillips's guilt beyond a reasonable doubt comprised these several, interlocking features:
1. D.M.'s trial testimony concerning Phillips's alleged July 8, 2000, sexual assault.
2. D.M.'s report of the incident to her 13-year-old sister M.T. a very short time after the assault occurred.
3. D.M.'s acknowledgment of the incident to her mother a day later, following *163 questioning by her mother precipitated by a remark made by M.T. to the mother.
4. The fact that D.M. subsequently repeated her description of the incident to a police officer and a child-abuse investigator.
5. The fact that M.T. testified that Phillips had had sex with her on six occasions "when she was 13-years old" (she was 13 years old at the time of the July 8, 2000, incident involving D.M.) and testified that in August 2000 she was treated at the county health department for pelvic pain, which was cured by the antibiotics then prescribed.
6. The fact that when D.M. was examined by Dr. Brown six days after the alleged assault she was infected with chlamydia, a sexually transmitted disease requiring some exchange or contact of bodily fluids for transmission. However, the only evidence establishing that D.M. was in fact then infected with chlamydia was Dr. Brown's testimony, over objection, that the result of the "DNA probe test" performed by Alabama Reference Laboratories, Inc., on swabs he had obtained from D.M. and sent to that agency was reported back to him as being positive for the presence of chlamydia. The Court of Criminal Appeals concluded, and this Court now agrees, that the unauthenticated test result, and Dr. Brown's testimony concerning it, constituted inadmissible evidence that should not have been allowed.
7. The fact that a sample for another DNA probe test, obtained from D.M.'s mother by Dr. Dean on March 4, 2000, and sent by him also to Alabama Reference Laboratories was likewise reported by that company to be positive for chlamydia. However, the Court of Criminal Appeals concluded, and this Court agrees, that Dr. Dean's testimony concerning that unauthenticated laboratory test result was inadmissible and should not have been allowed. The significance of the fact that the mother had chlamydia in March 2000 was that she testified that Phillips was the only person with whom she was having sex during that time and that he did not use a condom.
As quoted above, the Court of Criminal Appeals concluded in its unpublished memorandum that "[t]he testimony of the victim alone is sufficient to establish a prima facie case of sexual abuse." That is true, but as noted above, this Court has held that even "[o]verwhelming evidence of guilt does not render prejudicial error harmless under Rule 45[, Ala. R.App. P.]" Hutcherson, 677 So.2d at 1209; and Ex parte Lowe, 514 So.2d 1049, 1050 (Ala. 1987). See, also, Ex parte Greathouse, 624 So.2d 208, 211 (Ala.1993) (acknowledging the possibility that prejudicial error could be harmless, however, when the evidence of the defendant's guilt is "virtually ironclad").
In Ex parte Casey, 889 So.2d 615, 621-22 (Ala.2004), this Court explained:
"`[B]efore the reviewing court can affirm a judgment based upon the "harmless error" rule, that court must find conclusively that the trial court's error did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant.' Ex parte Crymes, 630 So.2d 125, 126 (Ala.1993) (emphasis omitted)."
If the evidence concerning the chlamydial infections of D.M. and her mother, summarized above in paragraphs 6 and 7, is eliminated, one can hardly characterize the remaining evidence of Phillips's guilt as "ironclad"; it likewise does not reach the somewhat lower level of "overwhelming." Subtracting that erroneously admitted evidence, we are left with D.M.'s testimony as to what occurred, circumstantially *164 corroborated by the fact that she reported the incident to M.T. so soon after it occurred, acknowledged it to her mother the next day, and repeated her description of it to the police officer and the child-abuse investigator, and M.T.'s testimony that Phillips had had sex with her and that she had been treated with antibiotics for complaints of pelvic pain in August 2000, which pain was cured by the antibiotics.
The jury, having been informed by Dr. Brown that chlamydia was a sexually transmitted disease that required some exchange or contact of bodily fluids for transmission, would certainly attach significance to the fact that a nine-year-old girl was found to be infected with chlamydia six days after the alleged sexual assault. Likewise, the jury could hardly be expected not to be impressed by the fact, logically representing more than mere coincidence, that the girl's mother had been found to be infected with the same sexually transmitted disease only four months before and that the infection supposedly could have come only from Phillips. Once the jury had before it the fact that nine-year-old D.M. was found to be infected with chlamydia six days after the alleged assault and the fact that her mother had been found to have the same sexually transmitted disease only a few months before, when Phillips was her only sexual partner, it would be hard for the jury not to conclude that Phillips was the carrier in both instances. The mother's testimony establishing that he was the only one from whom she could have contracted her chlamydia would be highly corroborative of D.M.'s testimony to the effect that the person who transmitted the disease to D.M. was Phillips.
As noted, the Court of Criminal Appeals was of the opinion that "[i]n light of all the evidence properly offered by the State, the improper admission of the test results was unlikely to affect the jury's decision." In that regard, that court pointed out that Dr. Brown testified that he prescribed an antibiotic for D.M. and stated further during his testimony, without objection, that another doctor later found that D.M.'s chlamydia was cured. The record reflects that Dr. Brown testified that when he examined and took "swabs" from various parts of D.M.'s body for testing for chlamydia and gonorrhea, because she was brought to him with a complaint of "possible sexual abuse," he did not then know if she might have chlamydia. He had examined her vagina and rectum because of the nature of her complaint and had found no evidence of "any tearing or ripping or cuts on her or within her" and no other "physical signs of abuse." He read into evidence his official report of his examination of D.M.'s genital area:
"There are no abrasions, discolorations, bruises, petechia, or other lesions noted. She had no vaginal discharge. Her hymen is intact. The labial, vagina, and anus as well as all adjacent skin appear normal without noted lesions."
He did determine that D.M. had an ear infection "later that month," and he prescribed a "macro antibiotic" for treatment of it. The antibiotic would also be effective against a chlamydial infection. When the trial judge asked Dr. Brown, "Was [D.M.] cured of it? Did you see her back?" Dr. Brown answered, "Yes, Dr. Sester saw her subsequent to that and did another test that showed that it was cured." This testimony was elicited only after Dr. Brown had already been allowed to testify that the DNA probe test results on the swabs taken from D.M. were positive for chlamydia and that a chlamydia infection was "sexually transmitted." Thus, the court's question about whether D.M. had been cured of the chlamydia was not objectional at that point but would have been had the only evidence establishing *165 D.M.'s chlamydial infection, the laboratory test result, not already been admitted.
Likewise, the fact that Dr. Dean "properly testified" that he suspected, in advance of her laboratory test results, that D.M.'s mother had a chlamydial infection does not alter our analysis because that testimony would have been objectionable if the evidence of D.M.'s chlamydial infection had not already been put before the jury; as it was, Dr. Dean's testimony in that regard was relevant. Similarly, evidence of M.T.'s pelvic pain and the prescription of antibiotics to treat it and the testimony that "she was cured" were relevant under the circumstances, but would not have been if there had not already been presented to the jury the evidence of D.M.'s chlamydial infection.
Thus, all of this "properly offered" evidence was proper only because there had first been established the fact of D.M.'s chlamydial infection, which had been established only by Dr. Brown's improperly admitted testimony concerning the laboratory test result.
If the jury had been provided with the evidence discussed above except for the evidence relating to the chlamydial infections of D.M. and her mother and had convicted Phillips on the basis of that properly admitted remainder of evidence, would that verdict stand on appeal if challenged on the basis of insufficiency of the evidence to establish guilt beyond a reason doubt? Probably. All the jury really would have to do would be to believe D.M.'s testimony rather than Phillips's, particularly in light of the bolstering testimony of her sister that Phillips had had sexual intercourse with her during the same general time frame. Nonetheless, as discussed, that reduced quantum of evidence would not constitute "virtually ironclad" evidence of Phillips's guilt, and even overwhelming evidence of guilt does not render prejudicial error harmless under Rule 45, Ala. R.App. P.
Had the evidence of the chlamydial infections been excluded, the jury would have been provided essentially with the opposing versions of D.M. and Phillips, and if it had found his version to be more credible, or even if it found itself unable in the final analysis to determine who was telling the truth, it might have found itself unable to agree that Phillips was guilty beyond a reasonable doubt; it then could have returned a verdict of not guilty or perhaps have been deadlocked, necessitating a mistrial. Accordingly, we cannot ignore the probable effect on the jury of the inadmissible evidence of the chlamydial infections of both D.M. and her mother. We are therefore constrained to reverse the judgment of the Court of Criminal Appeals on that point and remand this case to it for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
NABERS, C.J., and LYONS and WOODALL, JJ., concur.
SEE, J., concurs specially.
STUART, SMITH, BOLIN, and PARKER, JJ., dissent.
SEE, Justice (concurring specially).
I concur fully in the main opinion; I write only to clarify my understanding of the appropriate standard of review.
In Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Supreme Court of the United States held that a lower court's violation of certain of a defendant's constitutional rights could be deemed harmless and therefore not require reversal of a conviction. In Ex parte Greathouse, 624 So.2d 208, 210 (Ala.1993), this Court explained:

*166 "In [United States v. Hasting, 461 U.S. 499, 509 (1983)], the Court observed that, `[s]ince Chapman, the Court has consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations,' id. (citations omitted), and stated that the proper question for a reviewing court to ask is: `[A]bsent the prosecutor's allusion to the failure of the defense to proffer evidence to rebut the testimony of the victims, is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty?' . . .
"Our harmless error rule provides in pertinent part:
"`No judgment may be reversed or set aside on the ground of misdirection of the jury . . . unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.'
"Rule 45, Ala.R.App.P."
Thus, in Greathouse this Court identified both a beyond-a-reasonable-doubt standard of review and a probably-affected-substantial-rights standard of review, without explaining the relationship between the two. Similarly, in Ex parte Hutcherson, 677 So.2d 1205 (Ala.1996), this Court again stated both standards.
I understand Rule 45 to set out the "harmless error" standard of review. We do not reverse or set aside a judgment, even where there was error below, if the error was harmless, that is, if it did not "injuriously affect[ ] substantial rights of the parties." Rule 45, Ala.R.App.P. In determining whether an error had such an injurious effect on a substantial right of a criminal defendant, the standard we must satisfy is whether it is "clear beyond a reasonable doubt that the jury would have returned a verdict of guilty" even had the error not occurred. Greathouse, 624 So.2d at 210.
For the reasons stated in the main opinion, I do not believe that it is "clear beyond a reasonable doubt that the jury would have returned a verdict of guilty" absent the improperly introduced evidence.
STUART, Justice (dissenting).
I respectfully dissent from the majority's conclusion that the improper admission of the test results indicating that the victim and her mother were infected with chlamydia was not harmless. Under the facts of this case, I do not believe that the improper admission of the test results resulted in substantial injury to Phillips's rights.
In Ex parte Hutcherson, 677 So.2d 1205, 1209 (Ala.1996), this Court held that the improper admission of "both `DNA matching' evidence and DNA population frequency statistics" created a prejudicial error that did result in substantial injury. In Hutcherson, this Court recognized that the admission of the DNA test results and the testimony of the forensic scientist presented scientific testimony establishing that "the semen found in the victim's rectum `matched' [the defendant's]," 677 So.2d at 1209, and, consequently, that this improperly admitted scientific evidence, which identified the defendant as the victim's attacker, contributed to the defendant's conviction and was not harmless.
Here, I conclude that the improper admission of the test results, which were based on a DNA probe, was harmless error. Unlike the DNA test results in Hutcherson, which resulted in the admission *167 of evidence that the defendant's DNA matched the DNA in the semen found in the victim's body, the DNA test results in this case established only that both the victim and the victim's mother were infected with a sexually transmitted disease. The improperly admitted scientific evidence did not identify Phillips as the source of the infection in either the victim's mother or the victim. I recognize that the victim's mother testified that Phillips was the only possible source of her infection. However, in my opinion the mother's testimony and the test results in this case, unlike the testimony and evidence in Hutcherson, which with a degree of scientific certainty identified the defendant as the offender, do not establish prejudice that resulted in substantial injury to Phillips. I have reviewed the evidence in this case, and I conclude, as did the Court of Criminal Appeals, that the improper admission of the test results was harmless beyond a reasonable doubt.
SMITH, BOLIN, and PARKER, JJ., concur.