33 So.3d 1262 (2007)
Ren Hawkins BROOKS
v.
STATE of Alabama.
CR-05-2384.
Court of Criminal Appeals of Alabama.
August 31, 2007.
Opinion on Return to Remand June 27, 2008.
Rehearing Denied August 15, 2008.
Certiorari Denied October 9, 2009 Alabama Supreme Court 1071633.
*1263 Jeffrey B. Austin, Florence, for appellant.
Troy King, atty. gen., and Marc S. Bass, asst. atty. gen., for appellee.
BASCHAB, Presiding Judge.
The appellant, Ren Hawkins Brooks, was convicted of two counts of first-degree sodomy, violations of § 13A-6-63(a)(3), Ala.Code 1975, and one count of first-degree sexual abuse, a violation of § 13A-6-66(a)(3), Ala.Code 1975. The trial court sentenced him to serve concurrent terms of twenty-five years in prison on the first-degree sodomy convictions and ten years in prison on the first-degree sexual-abuse conviction. The appellant filed a motion for a new trial, which the trial court summarily denied. This appeal followed.
The State presented evidence that the victim, H.F., was the appellant's step-daughter; that, when the victim was eight years old, the appellant touched her on her "private areas"; that, when the victim was about nine years old, the appellant started performing oral sex on her; and that, on a couple of occasions, the appellant made the victim perform oral sex on him. (R. 185.)
The appellant argues that the trial court erred when it refused to conduct an in camera review of the victim's records from the Children's Advocacy Center and Rape Response, Inc. He filed motions to compel the Children's Advocacy Center and Rape Response to provide him with the victim's counseling records. During the hearing on the appellant's initial motion, the following occurred:
"[DEFENSE COUNSEL]: Motion to compel the production of the counseling records. I think that's where we are on that. We have a copy of theif you're wanting to talk about the motion in limine to exclude the recorded statements, there's just a problem as to the original on the victim's recorded statement. I don't know which motion.
"THE COURT: Well let's just talk about the records of counselors at Children's Advocacy Center and/or Rape Response in various places. You have asked for both of those, correct?
"[DEFENSE COUNSEL]: Yes, Judge, and Joe Patterson appeared on behalf of Children's Advocacy Center this morning. I had Lee Nafe subpoenaed and you had extended that subpoena and instructed her to be here today. I have not heard from her. I had talked to her office either early yesterday morning or late Monday, I can't remember, and asked them to remind her to be here. Your office has advised me that she's called you and told you she's snowed in somewhere. She hasn't called me. She called Lindsey late yesterday afternoon and told Lindsey that but Lindsey told her we could not excuse her but we understand her plight.
"THE COURT: Well at any rate she is a counselor?
"[DEFENSE COUNSEL]: Right. My understanding from Mr. Patterson's representation in there in chambers with you, Judge, is that his position is they should submit those for in camera inspection.
"[PROSECUTOR]: That's not the State's position, Judge.

*1264 "THE COURT: Well tell me how you get around Section 34-8A-21, Section 15-23-42 and Rule 503?
"[DEFENSE COUNSEL]: Judge, those are not absolute privileges. Those make the records privileged unless or until the Defendant's constitutional right asserts that privilege or until the victim or someone on her behalf waives that privilege in this case and if Lee Nafe were here to testify pursuant to her subpoenashe was ordered to be herethe information I would go into would be that my evidence I would expect to be that that counseling largely was to prepare her for trial, that that wasshe went to a couple of counseling sessions. Then they quit counseling and they requested counseling to `get her ready for trial' or something to that effect. If there is anything of that nature going on in those counseling sessions, we're entitled to it.
"Again ifthere is an absolutethe Defendant has reason to believe based on the prior inconsistent statements and the prior exculpatory statements, not just inconsistencies but absolutely statements where the victim has denied the actions, denied the allegation or recanted the allegation or said this act didn't happen. Based on those statements the Defendant has an absolute reason to believe that those counseling records would contain that same information and if so, that information is exculpatory and that would require an in-camera review.
"I'm looking at [Department of Human Resources] records that show the victim said when questioned about the mouth touching her, she stated that he never put his mouth on her. She stated it once. She's likely stated it again and we're being denied records or we're being denied you even looking at the records to even see if she said it.
"THE COURT: Well based on the clear law, the clear statutes, clear rule the
"[DEFENSE COUNSEL]: Judge, one more basis may I say? If the Statethere was some discussion by the State. [The prosecutor] represented to me a week ago that he may very well call Lee Nafe as an expert. If he intends to call any of these counselors as an expert or intends to question them at all, then I believe that opens the door to the counseling records or at least to your reviewing them because I have a right to discover anything they have reviewed in rendering an opinion in the case.
"THE COURT: That opens up a different question but at this time where we are at this point in discovery, the counseling records or the counseling sessions, the interviews will not be provided because they are clearly privileged. All right. Still in the supplemental discovery request
"[DEFENSE COUNSEL]: Judge, you're denying the request for in camera inspection even though the Children's Advocacy Center lawyer told the Court he would submit the records for inspection?
"THE COURT: I am. I am. Privilege is privilege.
"....
"[DEFENSE COUNSEL]: Does that same ruling apply to Rape Response?
"THE COURT: Rape Response. My understanding is they are counselors under the statute and under the rule. Now if you want to try to present evidence that they're not counselors, they don't fall under that rule, I will be glad to hear that.
"[DEFENSE COUNSEL]: I would like to take the witness at least on voir dire to that issue as to what role, if they *1265 were conducting a forensic interview or providing counseling services or what. I'm taking their word that this was counseling.
"THE COURT: All right.
"[DEFENSE COUNSEL]: Well Lee Nafe did not show pursuant to my subpoena so I reserve the right to ask that
"THE COURT: I will take judicial notice that she's a counselor. There's no question about that, is there?
"[DEFENSE COUNSEL]: Well, Judge, she conducts forensic interviews when Monica Haddock is not available to and for the same agency that conducted the forensic interview in this case so I think it's a fine line there between separating and bifurcating our records when it serves our purpose so I think there's a real issue there."
(R. 21-26.)
Thereafter, defense counsel called Debbie Young, the executive director of Shoals Crisis Center and Rape Response. Young testified that Rape Response did not provide counseling services for the victim; that it provided referral services to its clients; that it did not conduct a forensic interview with the victim; that it was likely that someone with Rape Response had talked to the victim or someone in her family on the telephone; and that that was not a true counseling session. She also testified that Rape Response was opposed to producing the records because it considered conversations with its clients to be confidential; that people who telephoned the crisis line expected confidentiality; and that turning over its records could hurt the clients emotionally. Finally, Young testified that a victim services coordinator worked for her; that the coordinator provided personal advocacy to the victim; and that, in some cases, the coordinator would talk to victims, go to the hospital with them, refer them, and go to court with them. After Young testified, the following occurred:
"[DEFENSE COUNSEL]: I would move that you at least conduct an in camera inspection of those.
"THE COURT: [Prosecutor]?
"[PROSECUTOR]: I think it's a fishing expedition, Judge.
"THE COURT: All right. Motion to quash is granted. Thank you.
"[DEFENSE COUNSEL]: Judge, may I please ask the Court to state the grounds? You clearly had previously denied on the basis of the statute and that privilege clearly does not apply. You had said that your grounds were clearly that they were privileged. They clearly are not privileged based on that testimony.
"THE COURT: Now these two grounds, the confidentiality of conversations between victims and people in the position of Rape Response and the lack of a showing of any probative value.
"[DEFENSE COUNSEL]: Judge, with respect to the lack of any probative value, this court has in the court file and you have reviewed the DHR records with the statement in there that is absolutely contradictory to the allegations in this case, and there is absolutely sufficient basis for belief that she would have made similar statements to other people in other interviews."
(R. 29-30.)
We addressed a similar situation in D.P. v. State, 850 So.2d 370, 371-75 (Ala.Crim. App.2002), as follows:
"The appellant contends that the trial court erred in denying his motion to compel production of T.H.'s mental-health records. The appellant argues that although the records are privileged by § 34-26-2, Ala.Code 1975, they were *1266 essential to his attack on T.H.'s credibility and, he says, the trial court's denial of his motion to compel production of the records denied him the right to confront his accuser.
"Before trial, the appellant filed a written motion to compel the production of T.H.'s mental-health records. The appellant argued that T.H. had been an outpatient at a mental-health facility approximately six months before the incident giving rise to the present charges occurred and that the records from that treatment may have contained information relevant to his defense of consent. After a hearing, during which T.H. asserted her privilege to keep the records confidential, the trial court denied the motion. The appellant then filed a written motion to reconsider the earlier denial of his motion to compel, and the trial court held another hearing. During that hearing, the following occurred:
"`THE COURT: So, do you [prosecutor] have a position?
"`[Prosecutor]: I do, sir. I would have no objection if the defendant would allow me to subpoena any mental health records and the marriage counsel records, any therapy records, any records from hospitals, inpatient or outpatient since 1995.
"`[Defense counsel]: Judge, they don't have a Sixth Amendment right to confront the defendant and
"`THE COURT: Well, but I mean it seems in fairness that you do one, you do the other.
"`[Defense counsel]: Well, Judge, I'm not going to agree to that. That's
"`THE COURT: Well, then I'm not going to grant your motion. That's my discretion.
"`[Defense counsel]: Well, Judge, it's not unbridled. If I could have [a] second to talk to my client and see what he wants to do.
"`....
"`THE COURT: And you say you want to use them to attack her credibility? Well, what do you want to use them for?
"`[Defense counsel]: To attack her credibility, Judge, but again, I haven't seen the records and without seeing them
"`THE COURT: Furthermore there is nothing in the records to suggest that DIF [sic], that's the person who was suffering from an emotional mental defect that would have materially affected the accuracy of his testimony or affected his ability to know and correctly relate the truth to justify well, you know, I guess I have to look at them, but at this point I'm going to deny your motion. When did you file your motion?
"`[Defense counsel]: Judge, my subpoena was filed probably a month ago. I mean this has just beenI filed my original motion to compel probably three weeks ago and then the clerk set it for last
"`THE COURT: When was arraignment? Well, it might be that I should look at them, but at this point I can't tell. It looks to me like both of you want to use records against each other's credibility and you can't concede that she has the right to look at your records and you say it's a different issue. But I'm going to deny it.'
"(R. 11-14.) The record does not reflect that the trial court ever looked at the records to determine whether they would be helpful to the defense in attacking T.H.'s credibility.

*1267 "In addressing an identical issue in Schaefer v. State, 676 So.2d 947 (Ala. Crim.App.1995), this Court stated:
"`The appellant appeals, raising nine issues. However, at this time, we address only the issue whether the trial court committed reversible error in denying the appellant's motion to produce [the victim's] psychiatric records and the records pertaining to [the victim] in the files of the Alabama Department of Human Resources. The appellant contends that [the victim] is a "habitual liar" with a history of mental instability and that his records were necessary for purposes of cross-examination to impeach his credibility. The trial court held, and the state now contends, that the records were privileged and that their production for confrontation purposes was prohibited by statute.
"`The records are privileged pursuant to §§ 12-15-100 and -101, 15-23-41 and -42, and 34-26-2. The appellant argues that his Sixth Amendment right of confrontation outweighs the statutory privilege and the victim's right to confidentiality. A witness's claim of a statutory privilege may, under certain circumstances, violate a defendant's Sixth Amendment rights of confrontation and cross-examination. Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); United States v. Lindstrom, 698 F.2d 1154 (11th Cir.1983); Ex parte Lynn, 477 So.2d 1385 (Ala.1985); Kirby v. State, 581 So.2d 1136 (Ala.Cr.App. 1990); Thornton v. State, 527 So.2d 143 (Ala.Cr.App.1987), cert. quashed, 527 So.2d 146 (Ala. 1988).
"`The issue presented here is whether, under the circumstances of this case, denial of access to the privileged records deprived the appellant of his right of confrontation. We adhere to the principle that the opportunity for cross-examination is central to the right of confrontation. However, this does not mean that records of this type must be disclosed simply because they relate to a key state's witness whose claimed lack of credibility is the foundation of the defense. There are strong public policy reasons for maintaining the confidentiality of such records. In this state, where a party's right of discovery has come into conflict with a communication that is the subject of a statutory privilege communication, the courts have decided the issue on the facts of each particular case or, in other words, on a case-by-case basis. Ex parte Rudder, 507 So.2d 411 (Ala.1987); Kirby v. State. The reasons for confidentiality must in each case be weighed against the defendant's right to bring to the jury's attention facts affecting the witness's credibility. Davis v. Alaska. Access to such records must be left to the discretion of the trial court, which is better able to assess the probative value of the evidence contained in the records as it relates to the particular case before the court, and to weigh that value against the interest in the confidentiality of the records. In order to determine whether the records contain exculpatory or impeachment evidence that should be disclosed, the trial court of necessity must examine the records. That examination should be in camera. See Kirby v. State, where we suggested the procedure be used. The trial court should also make specific findings, and the privileged records should be made a part of the trial record for purposes of appeal. In this case, the trial court refused to order the production of the *1268 records for an in camera inspection and, thus, no examination was made.
"`We find that there is sufficient evidence in the record to warrant an in camera examination by the trial court of the privileged records for the purpose of discovering whether disclosure of any material relevant to the issue of credibility of the witness is appropriate in this case. We, therefore, remand this cause to the trial court with instructions that that court conduct an in camera examination of the records ... pertaining to [the victim] and to determine if those records contain any exculpatory or impeachment evidence that would bear upon the question of the appellant's guilt and the credibility of [the victim].'
"676 So.2d at 948-49 (brackets and emphasis added). See also Kirby v. State, 581 So.2d 1136 (Ala.Crim.App.1990).
"Similarly, here, we find that an in camera examination by the trial court of the privileged records is warranted in this case to determine whether those records contain any material relevant to the issue of T.H.'s credibility and whether disclosure of these records would have been appropriate in this case. T.H. claimed that the appellant raped her; the appellant's defense was consent. In his motion to compel production and at the hearing on the motion, the appellant alleged that attacking T.H.'s credibility was an essential part of his defense and that he believed T.H.'s mental-health records contained information relevant to her credibility. Because a central issue in this case was T.H.'s credibility, the trial court's statement during the second hearing that it should inspect the records before ruling on the appellant's motion was correct. However, as noted above, nothing in the record indicates that the trial court did, in fact, inspect the records, and those records are not included in the record on appeal for this Court's review. Moreover, we note that the record indicates that the trial court denied the appellant's motion to compel the records in part because the appellant was not willing to waive his privilege with respect to similar records. However, as this Court pointed out in both Schaefer and Kirby, a claim of statutory privilege may, in some cases, violate a defendant's Sixth Amendment right to confrontation and cross-examination and the determination whether the privilege outweighs a defendant's Sixth Amendment rights is a balancing processthe reasons for the privilege must be weighed against the defendant's right to present evidence affecting the credibility of witnesses. A defendant's decision not to waive his statutory privilege is not a part of this balancing process and cannot be used against a defendant in determining whether the privilege outweighs the right to confrontation and cross-examination.
"We do not hold that an in camera inspection of privileged documents is always necessary before a trial court denies a defendant's motion to compel production. Rather, we hold that when a defendant sufficiently alleges that privileged documents may contain evidence relevant and material to an issue in the case, the trial court should inspect the documents in camera before ruling on the defendant's motion. We note that in Schaefer, this Court stated that there was `sufficient evidence in the record to warrant an in camera examination' of the requested records. 676 So.2d at 949 (emphasis added). That language was not meant to impose a burden on a defendant to actually present `evidence' in order to obtain production of privileged documents; rather, it was meant *1269 to place the burden on a defendant to sufficiently allege the relevance and materiality of the evidence that he or she is requesting be produced.
"We agree with the appellant that the trial court in this case abused its discretion in refusing to examine T.H.'s mental-health records before denying the appellant's motion to compel the production of those records. Therefore, we remand this case to the trial court for it to conduct an in camera inspection of T.H.'s mental-health records and to make specific findings regarding (1) whether the records contain material relevant to T.H.'s credibility, and, (2) if so, whether, after weighing the reasons for the privilege against the appellant's right to confrontation and cross-examination, disclosure would have been appropriate in this particular case."
(Footnotes omitted.)
In this case, the defense asserted that the victim had previously made inconsistent statements regarding the offenses; that the victim had made prior statements denying that the abuse occurred or recanting the allegations of abuse; that records from the Alabama Department of Human Resources included statements in which the victim had denied that the appellant had put his mouth on her; and that it believed that the victim's counseling records might include similar exculpatory information. Based on these assertions, the appellant made a sufficient showing regarding the potential relevance and materiality of the records he was requesting, and the trial court abused its discretion when it refused to conduct an in camera inspection of those records. Therefore, we remand this case to the trial court with instructions that it conduct an in camera review of the victim's records from the Child Advocacy Center and Rape Response and determine whether the records contain any exculpatory evidence or evidence that would be relevant to impeach the victim's credibility. If the records include such evidence, the trial court shall also make specific, written findings of fact regarding whether, after weighing the reasons for the privilege against the appellant's right to confront and cross-examine witnesses against him, disclosure would have been appropriate in this case. The trial court shall take all necessary action to see that the circuit clerk makes due return to this court at the earliest possible time and within 56 days after the release of this opinion. The return to remand shall include the trial court's specific, written findings of fact; copies of the victim's records from the Child Advocacy Center and Rape Response; and, if applicable, a transcript of any remand proceedings.[1]
REMANDED WITH INSTRUCTIONS.
McMILLAN, SHAW, WISE, and WELCH, JJ., concur.

On Return to Remand
PER CURIAM.
The appellant, Ren Hawkins Brooks, was convicted of two counts of first-degree sodomy, violations of § 13A-6-63(a)(3), Ala.Code 1975, and first-degree sexual abuse, a violation of § 13A-6-66(a)(3), Ala. Code 1975.[1] He was sentenced to concurrent terms of 25 years in prison on the sodomy convictions and 10 years in prison on the sexual-abuse conviction.
*1270 Brooks was first tried in February 2006. A mistrial was declared after the jury was unable to reach a verdict. Brooks was tried a second time in August 2006 and was convicted of two counts of sodomy in the first degree and one count of sexual abuse in the first degree. He appealed to this Court.
On August 31, 2007, we remanded this case to the circuit court with instructions that that court conduct an in camera review of records from the Children's Advocacy Center and Rape Response relating to the victim, which Brooks argued he was entitled to, and determine whether the records contained any exculpatory evidence or evidence that would tend to impeach the victim's credibility. See Brooks v. State, [Ms. CR-05-2384, August 31, 2007] ___ So.2d ___ (Ala.Crim.App.2007).
The circuit complied with our instructions and submitted the following order on return to remand:
"As directed this court has obtained the counseling records from the Cramer Children's Center (formerly known as the Children's Advocacy Center) and from Rape Response. The court has carefully read said records and examined them for potentially exculpatory information. Nowhere in said records was it found that the victim made a statement inconsistent with her in-court testimony or inconsistent with her prior out-of-court statements. The records would not be relevant to impeach the victim's credibility. Nothing in said records is otherwise exculpatory.
"After weighing the reasons for the privilege against the appellant's right to confront and cross-examine witnesses against him this court determines that disclosure of the records would not be appropriate in this case."
We have examined the records, which were filed under seal with this Court, and agree with the circuit court that the records contain nothing remotely exculpatory or inconsistent with the victim's statements or with her trial testimony. Accordingly, we affirm the circuit court's denial of Brooks's motion for access to the records from the Cramer Children's Center (formerly the Children's Advocacy Center) and Rape Response.
The State's evidence tended to show that H.F. was 14 years old at the time of the second trial. H.F. testified that from the time she was 8 until she was 11 Brooks molested her. She said that it started with Brooks touching her "private areas" and that it progressed to him performing oral sex on her and Brooks having H.F. perform oral sex on him.
Brooks raises a number of other issues in his brief to this Court. However, because it is necessary to reverse the convictions in this case we address only the issue that merits reversal.
Brooks argues that the circuit court abused its discretion in allowing the State to introduce test results indicating that H.F. had Type 1 herpes when, he argues, the State failed to establish a sufficient predicate for the samples. Specifically, he argues that the State failed to establish a proper predicate for the vaginal swabs taken from H.F., the blood drawn from H.F., and the blood drawn from Brooks.
The State argues that any weak links in the chain of custody affected the credibility of the evidence and not its admissibility and that the test results were correctly received into evidence.
The record shows that when the State attempted to introduce the test results Brooks objected and argued that he had not been given an opportunity to cross-examine anyone from the lab where *1271 the tests had been conducted. The circuit court sustained the objection. (R. 155.) The record further shows that when the State later introduced State's Exhibit 8, which was the test results, Brooks objected stating that there was no "chain of predicate." (R. 497.)[2] The circuit court overruled the objection and allowed the test results to be admitted.
Dr. Ashley Burchfield, a physician at Rogersville Family Practice, testified that she examined H.F. in October 2004. She said that she used a swab to collect a sample from the blisters on H.F.'s genitals, that she put the swab in a "collection tube," and that she sent the swab to Quest Diagnostics Laboratory in Atlanta for testing. Dr. Burchfield said that about one week later she drew blood from H.F. and also sent the blood to Quest Diagnostics for testing. Dr. Burchfield explained that herpes has two formsType 1 and Type 2. She testified that Type 1 typically is cold sores and that Type 2 is genital blisters. Dr. Burchfield further testified that Type 1 herpes can be caused by receiving oral sex from an infected individual.
Dr. Thomas Burgess, the technical director for Quest Diagnostics Laboratory in Atlanta, testified that he is in charge of quality control for the lab. He testified concerning the general procedures and protocols used by Quest Diagnostics to ensure the integrity of the various samples sent to Quest Diagnostics for testing. The report generated by Quest on the vaginal swab and blood sample taken from H.F. was admitted during Dr. Burgess's testimony. (Exhibit 8.) Dr. Burgess explained the results of the tests conducted on the samples. He testified that the vaginal swab indicated that H.F. had herpes and that the blood test enabled the lab to isolate and determine that H.F. had Type 1 herpes. Dr. Burgess could not testify to any specifics concerning the samples taken from H.F. and tested at the lab.
Brooks presented the testimony of Dr. James Fitts, Jr., a physician in Columbia, Tennessee. He testified that he was contacted and asked to conduct a herpes test on Brooks. He said that he drew blood and sent it out for testing and that the tests revealed that Brooks had Type 1 herpes. At the end of Dr. Fitts's testimony Brooks admitted the test results as Defendant's exhibit 5.[3]
The Alabama Supreme Court has explained the following concerning "chain of custody":
"The chain of custody is composed of `links.' A `link' is anyone who handled the item. The State must identify each link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to each link's possession of the item: `(1) [the] receipt of the item; (2) [the] ultimate disposition of the item, i.e., transfer, destruction, or retention; and (3) [the] safeguarding and handling of the item between receipt and disposition.' Imwinklereid, The Identification of Original, Real Evidence, 61 Mil.L.Rev. 145, 159 (1973)."
*1272 Ex parte Holton, 590 So.2d 918, 920 (Ala. 1991).
In this case the chain of custody for the vaginal swab and the blood sample taken from H.F. is totally lacking. In regard to the vaginal swab, the record shows that Dr. Burchfield took a sample, put it in a tube, and sent it to Quest Diagnostics. There is no testimony concerning the method used to safeguard the sample after it was collected and sent to the lab. Neither is there any testimony as to how the samples were transported from Dr. Burchfield's office to the lab for testing. Indeed, no individuals in the chain of custody, other than Dr. Burchfield, are identified. We do not know the individual who accepted the sample at the lab or the individual who conducted the tests on the samples. We do not know whether the samples were received at the lab in the same condition as when they were sealed and transported. The record is totally devoid of the requisite chain of custody for these samples. We have no means of determining whether the integrity of the samples was protected from the time they were collected until they were tested at the lab. There is even less testimony on the chain of custody for the blood sample. There are many missing links in the chain of custody for both the vaginal swab and the blood sample.
In Birge v. State, 973 So.2d 1085 (Ala. Crim.App.2007), a case that presents strikingly similar facts to this case, we held that the State failed to present a sufficient chain of custody for samples collected from the victim's body. In holding that the circuit court erred in allowing a doctor to testify about the results of the tests conducted on the samples, we stated:
"The chain of custody for the samples removed from Cecil's body contains several missing links; the chain of custody is so deficient in this case that we are unable to identify precisely how many people handled the samples Dr. Pless removed from Cecil's body. This is significant because Dr. Pless testified that a number of people would have handled the samples. We can infer from the record that a courier transported the samples, but we are uncertain of the date of the transfer because Dr. Pless conducted the autopsy on May 25, 2001, and testified that the samples would have been transferred to the lab the following day, but the samples were apparently not received by the analyst or analysts until May 29, 2001. We would expect that someone at the laboratory received the samples and catalogued them into a tracking system; that the person who received the samples would have placed them in a secure, temperature-controlled location until the analyst or analysts retrieved the samples for testing; that the analyst or analysts would have picked up the samples from the secure location and would have safeguarded them during the testing process to ensure that the samples were not contaminated or that the reliability of the test results was not otherwise compromised. However, all of the foregoing are matters of pure speculation because the State failed to establish the chain of custody for the samples after Dr. Pless's assistant placed them in the refrigerator. The State failed to identify any of the links who handled the evidence after Etame secured it, and it therefore could provide no information about the receipt, disposition, and safeguarding and handling of the evidence, all of which are required by Ex parte Holton. Without this necessary information, the State's chain of custody has several missing links, and missing links, the Alabama Supreme Court has said, render evidence inadmissible.
"The evidence for which the State failed to establish a proper chain of custody *1273 was the crux of the State's case. The toxicology evidence presented the only proof that Cecil did not die of natural causes, as had been initially believed. Only the toxicology results established that Cecil died of a multiple-drug overdose, and that evidence allowed the jury to conclude that the State presented sufficient proof that Birge had murdered her husband. If the toxicology report had not been admitted, Dr. Pless could have testified about the results of his own observations from the autopsy, but he would not have been able to testify about the drugs discovered in Cecil's system, nor would he have been able to testify that the cause of death was a multiple-drug overdose.
"In Lee v. State, 748 So.2d 904 (Ala. Crim.App.1999), overruled in part on other grounds, Pruitt v. State, 954 So.2d 611 (Ala.Crim.App.2006), we reversed a conviction as a result of missing links in the chain of custody. Lee was convicted of unlawful distribution of a controlled substance following a drug sale to an undercover agent. The testimony at Lee's trial established that the crack cocaine was delivered by the undercover agent, David Larimer, to a second agent, Mike Gulledge, who delivered it to drug chemist Kelly Cannon at the Alabama Department of Forensic Sciences for testing. The individuals who handled the evidence were identified, but `[t]his is essentially all of the testimony contained in the record concerning the chain of custody ... in this case.' Lee, 748 So.2d at 911. We reversed the conviction and stated:
"`In the instant case, there were clearly missing links in the State's chain of custody. There is no evidence, either direct or circumstantial, reflecting what Larimer did with the substance he purchased from Lee or reflecting how Larimer handled and safeguarded the substance while it was in his possession before it was delivered to Gulledge. There was no evidence reflecting that the substance was ever sealed in an evidence envelope or safeguarded in any way by Larimer. There is no evidence, either direct or circumstantial, reflecting what Gulledge did with the substance while it was in his possession or how Gulledge handled or safeguarded the substance while it was in his possession. There is no evidence reflecting that the substance was ever sealed in an evidence envelope or safeguarded in any way by Gulledge. Moreover, Cannon did not state that the substance was in a sealed condition when she received it. Her testimony reflected only that she sealed the envelope the evidence was in after she completed her testing. To reiterate, there is no testimony reflecting where the substance was kept or how it was kept before it was presented to Cannon. Nor was there any evidence that when the substance was received at the lab it was packaged so as to be tamper-resistant.
"`In Ex parte Cook, 624 So.2d 511 (Ala.1993), the Alabama Supreme Court held that a link in the chain of custody of certain evidence (cigarette butts and socks) was missing even though Birmingham police officer Belinda Weldon testified that she had directed another officer to collect the evidence and had watched the officer collect it. The Alabama Supreme Court held that the evidence was inadmissible because "the State did not establish when these items were sealed or how they were handled or safeguarded from the time they were seized until [Phyllis] Rowland[, a forensic serologist at the Alabama Department *1274 of Forensic Sciences] received them." 624 So.2d at 514. The Alabama Supreme Court said that the evidence in question "was inadmissible under Holton." 624 So.2d at 514. Thus, in Lee's case, as in the Cook case, the State failed to show for the record each "`of the three criteria as to each link[; thus,] the result is a "missing" link, and the item is inadmissible."' Harrison v. State, 650 So.2d 603, 605 (Ala.Cr.App.1994) (quoting Ex parte Holton, 590 So.2d 918, 920 (Ala.1991)).
"`Moreover, this is not a case where a witness specifically identified the evidence and where the condition of the evidence was not an issue in the case. Section 12-21-13, Ala.Code 1975 provides:
""`Physical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration by a jury or court due to a failure to prove the chain of custody of the evidence. Whenever a witness in a criminal trial identifies a physical piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper. The trial court in its charge to the jury shall explain any break in the chain of custody concerning the physical evidence."
"`In Land v. State, 678 So.2d 201 (Ala.Cr.App.1995), aff'd, 678 So.2d 224 (Ala.1996), a case which appears to rely on § 12-21-13, this court ruled that where a witness can specifically identify the evidence, and its condition is not an issue in the case, then the State is not required to establish a complete chain of custody in order for the evidence to be admitted into evidence. We stated: "The eyeglasses were admissible without establishing a chain of custody because [the testifying officer] was able to specifically identify them, and their condition was not an issue in the case." Land, 678 So.2d at 210. However, the Land opinion distinguished Cook stating:
"`"The State was required to establish a complete chain of custody for the cigarette butts and socks collected at the scene of the homicide in Ex parte Cook, 624 So.2d 511 (Ala.1993), but not for the eyeglasses collected at the scene of this homicide because the items in Cook, unlike the eyeglasses here, were subjected to scientific analysis and their condition was at issue."
"`Land v. State, 678 So.2d at 210.
"`The evidence in Lee's case cannot be admissible under § 12-21-13, Ala. Code 1975, because no witness directly testified at trial that the substance tested by Cannon was the same substance Lee had sold to Larimer. Moreover, the condition of the substance, i.e., whether it was a cocaine, was the crux of the case. Therefore, because there were missing links in the chain of custody, the trial court erred in admitting the substance into evidence over Lee's chain-of-custody objection.'
"748 So.2d at 912-13.
"In Lee, each person who handled the evidence was identified; here, we have no information identifying anyone who handled the samples in this case after Dr. Pless saw Etame put them in the refrigerator. Although Dr. Pless testified that he placed the samples in tubes and labeled them, then placed the tubes in biohazard bags, we have no testimony direct or circumstantialindicating *1275 the condition of the evidence when it was received at the lab, and we have no evidence as to the manner in which the samples were handled or safeguarded after the samples were placed in the refrigerator on May 25. Thus, as in Lee, the State failed to present testimony about the safeguarding and handling of the evidence. This deficiency is compounded by the State's failure to identify many of the links in the chain.
"We note, additionally, that Dr. Pless's testimony created some discrepancy regarding the handling of the evidence, because he stated that the samples would have been transferred on May 26, yet the toxicology report indicates the samples were received on May 29, leaving a gap of several days when the whereabouts of the crucial evidence are unknown. While we could surmise that Dr. Pless was mistaken about the date of transfer, and we could infer that a courier picked up the samples on the next working day after the Memorial Day holiday, it would be wholly inappropriate for us to engage in such surmise and inference, because this is precisely the type of testimony that the State should have presented to establish the chain of custody for the samples. Thus, as in Lee, the State failed to prove a complete chain of evidence for the crucial toxicology evidence, and the trial court erred to reversal when it allowed Dr. Pless to testify to the results of the toxicology analysis.
Birge, 973 So.2d at 1094-99 (footnotes omitted). We held in Birge:
"As in Green [v. Alabama Power Co., 597 So.2d 1325 (Ala.1992),] the case before us presents missing links from the chain of custody for evidence that was crucial to prove the State's case. Although the State contends that the chain it presented has only weak, not missing, links, that argument is not persuasive. The record before us contains no testimony identifying anyone who handled the evidence after it was placed in the refrigerator. Thus, not only does the record lack the necessary testimony about the receipt, disposition, and safeguarding by those who handled the evidence, it lacks the very identification of those individuals who came into contact with it after Dr. Pless gave it to Etame. Importantly, there is no testimony from the analyst who received the evidence indicating what evidence was received, when it was received, or that it was received in a sealed package that appeared not to have been tampered with. There is simply no evidence to prove who handled the samples extracted by Dr. Pless from Cecil's body, that those samples were safeguarded before they were analyzed, or that the samples were, in fact, the ones removed from Cecil's body. Contrary to the State's assertions at oral argument, the fact that Dr. Pless had general knowledge of the procedures used at the AIT lab could not satisfy the requirements of Ex parte Holton that the State identify the links and provide testimony about the receipt, disposition, and safeguarding of the evidence. Nothing in Alabama caselaw permits such speculative and generalized testimony to satisfy the requirements to prove the chain of custody. Nor can this Court engage in conjecture to fill in large gaps in the State's inadequate chain of custody."
Birge, 973 So.2d at 1102. See also 77 A.L.R.5th 201, Authentication of Blood Sample (2000).
In Suttle v. State, 565 So.2d 1197, 1199 (Ala.Crim.App.1990), we held that it was reversible error for the court to allow test results conducted on a blood sample to be admitted when there was not a sufficient *1276 chain of custody for the sample. We stated:
"With regard to specimens taken from the human body, it is also incumbent upon the prosecution to show that the specimen analyzed was in fact the specimen taken from the defendant. In such cases, `[t]he "chain of custody" involves "the necessity of proving where and by whom the specimen was kept and through whose hands it passed." J. Richardson, Modern Scientific Evidence, Section 13.14a (2d ed.1974).' Gothard v. State, 452 So.2d 889, 890 (Ala.Cr.App.), cert. stricken, 450 So.2d 479 (Ala.1984). ... `[W]here the substance analyzed has passed through several hands the evidence must not leave it to conjecture as to who had it and what was done with it between the taking and the analysis.' Rodgers v. Commonwealth, 197 Va. 527, 90 S.E.2d 257, 260 (1955) (emphasis added).
"The importance of the chain of custody of a blood sample was demonstrated by this court in Miller v. State, 484 So.2d 1203 (Ala.Cr.App.1986). There a lab technician took a blood sample from the defendant, placing it in `"a vacutainer type instrument"' which he then wrapped in tape and gave to a trooper. The trooper took the sample to the trooper post, `"put it in an envelope, sealed it and initialed it,"' then placed it `in "the mail,"' meaning the department's outgoing mail, not the United States mail. The toxicologist `received "this container in the mail'" and determined the blood alcohol level of the sample. 484 So.2d at 1204.
"We held that the prosecution had failed to establish the requisite chain of custody because there was no showing of the use of the United States mail so as to raise the presumption that `"articles shipped by mail [United States Postal Service] are delivered in substantially the same condition as when placed in the mail box or post office."' 484 So.2d at 1205."
565 So.2d at 1199.
In this case, the State failed to present a sufficient chain of custody for the vaginal swab and the blood sample collected from H.F. Accordingly, the circuit court erred in allowing testimony concerning the test results on those samples.
Moreover, the Alabama Supreme Court in Ex parte Phillips, 962 So.2d 159 (Ala.2006), addressed whether the erroneous admission of test results based on missing links in the chain of custody for the samples used for the test was harmless error, given the victim's testimony that the defendant had sexually abused her. The Phillips Court, reversing this Court's holding that the error was harmless, noted that "overwhelming evidence of guilt does not render prejudicial error harmless." 962 So.2d at 165. The Supreme Court then wrote:
"Had the evidence of the chlamydial infections been excluded, the jury would have been provided essentially with the opposing versions of D.M. and Phillips, and if it had found his version to be more credible, or even if it found itself unable in the final analysis to determine who was telling the truth, it might have found itself unable to agree that Phillips was guilty beyond a reasonable doubt; it then could have returned a verdict of not guilty or perhaps have been deadlocked, necessitating a mistrial. Accordingly, we cannot ignore the probable effect on the jury of the inadmissible evidence of the chlamydial infections of both D.M. and her mother."
962 So.2d at 165.
As the Alabama Supreme Court cautioned in Phillips, we cannot "ignore the *1277 probable effect" on the jury of the erroneous admission of the extremely prejudicial test results. This is especially true in this case given that Brooks's first trial ended in a mistrial, after this same evidence was admitted, because the jurors were unable to reach a unanimous verdict on the sodomy charges. (R. 45-48.)
Accordingly, we have no choice but to reverse Brooks's convictions and remand this case to the circuit court for proceedings consistent with this opinion.
REVERSED AND REMANDED.
McMILLAN, SHAW, and WELCH, JJ., concur.
BASCHAB, P.J., concurs specially, with opinion.
BASCHAB, Presiding Judge, concurring specially.
I agree with the majority's conclusion that we must reverse this case because the State did not establish an adequate chain of custody for the vaginal swab and blood sample collected from the victim. However, I write specially to note that the appellant raised several potentially meritorious issues which the State should be aware of in the event of a retrial.
NOTES
[1] Because of our disposition of this case, we pretermit discussion of the remaining claims the appellant raises in his brief to this court.
[1] By an amendment effective July 1, 2006, subsection (a)(3) was deleted from § 13A-6-66. The provisions of that subsection were reenacted as § 13A-6-69.1, and the offense was made a Class B felony.
[2] Brooks's objection that there was no "chain of predicate" was sufficient to preserve this issue for appellate review. See Ex parte Works, 640 So.2d 1056 (Ala. 1994) (noting that objection that "proper predicate" had not been laid was sufficient to preserve issue for appellate review); Jennings v. State, 588 So.2d 540 (Ala.Crim.App.1991) (noting that "improper predicate" and "that is not the proper way to do that" were sufficient objections to preserve chain-of-custody issue for appellate review).
[3] We note that if there was error in admitting Defendant's exhibit number 5, it was invited by Brooks. See Bedsole v. State, 974 So.2d 1034 (Ala.Crim.App.2006).